In re Complaint of Cincinnati Radiotelephone Systems,
Inc., et al.: Radio Relay Corp.—Ohio, Appellant, v.
Public Utilities Commission of Ohio et al., Appellees.

[Cite as Radio Relay Corp. v. Pub. Util. Comm. (1976),
45 Ohio St. 2d 121.]

(No. 75-344—Decided February 18, 1976.)

122

*Messrs. Vorys, Sater, Seymour & Pease, Mr. Sheldon A. Taft* and *Mr. Stephen R. Buchenroth,* for appellant.

*Mr. William J. Brown,* attorney general, *Mr. Charles S. Rawlings* and *Mr. Robert T. Maison,* for appellee Public Utilities Commission.

*Messrs. George, Greek, King, McMahon & McConnaughey* and *Mr. A. Charles Tell,* for intervening appellees.

CORRIGAN, J.

I.

The record establishes that Radio Relay is a radio paging company and is licensed and regulated by the Federal Communications Commission.

Radio paging is a signalling service for busy persons. Upon request of a subscriber designee, the paging company broadcasts a radio signal to trigger a pocket-sized "beeper" radio receiver carried by the subscriber, who would respond to this "beep" signal and call his office to find the reason he is paged.

The record shows that, until September 19, 1972, Radio Relay's signalling service was a manual service, pursuant to which a person, wishing to page a subscriber, called Radio Relay's dispatch office and gave to a dispatch operator a verbal instruction to page the subscriber. The

dispatcher manually transferred this instruction into Radio Relay's dispatching terminal by punching certain buttons. Thereby, Radio Relay's radio transmitter broadcast a signal corresponding to subscriber's pager. This signal which had been broadcast would cause subscriber's receiver to beep, alerting the subscriber to call his message center. In this process, the subscriber did not communicate back to the paging company except by going to a telephone and placing a call.

In September 1972, Radio Relay added an automatic answering device to its facilities. This device was interconnected to the Cincinnati Bell, Inc., telephone wire serving appellant, after assurance of the Public Utilities Commission staff* that Radio Relay was not regulated as

---

*STATE OF OHIO
PUBLIC UTILITIES COMMISSION
111 NORTH HIGH STREET
Columbus, Ohio 43215

JOHN J. GILLIGAN
GOVERNOR

August 25, 1972

Mr. Earl R. Huffman
Frost & Jacobs
2900 DuBois Tower
Cincinnati, Ohio 45202

Re: Radio Relay Corporation—Cincinnati Bell Inc.

Dear Mr. Huffman:

I understand that a question has arisen as to the necessity of Public Utilities Commission approval of a proposed Dial Access Agreement between your client, Cincinnati Bell Inc., and Radio Relay Corporation. Radio Relay Corporation proposes to rely upon this agreement for the conduct of its one-way radio paging system in the Cincinnati area.

Although Ohio law may permit this Commission to certificate interconnected one-way radio paging systems, the Commission has not as yet done so. The Commission has never conducted any certification proceeding for a one-way radio paging system inter-connected to a land line telephone system. The Commission's only involvement with such one-way radio paging systems has been to take notice of them when they are offered by companies otherwise certificated or regulated by this Commission.

Since the Commission has not regulated one-way radio paging systems as public utilities, it would not be necessary for your client to secure Commission approval of your proposed Dial Access Agreement unless

a public utility. A person wishing to page a subscriber would still call a number at Radio Relay's dispatch office but under the new system this call would be answered automatically by the answering device, whereupon the caller would punch on his touch-tone telephone a sequence of four buttons corresponding to the subscriber's pager number. The automatic answering service would receive and automatically transfer these punch buttons into the Radio Relay's dispatching terminal.

Just as with Radio Relay's manual system, the dispatching terminal would then cause appellant's radio transmitter to broadcast a two-tone radio signal corresponding to the subscriber's pager number. This radio signal, if received, would cause the subscriber's receiver to "beep," signalling the subscriber to call a message center. Under this new system, there can be no verbal communication, so, the subscriber cannot communicate back to the caller or the paging company except by going to a telephone and placing a call. No two-way communication is possible under the system.

The sole change brought about by the interconnected automatic answering device was that Radio Relay replaced a human dispatch operator with an automatic answering device, which made the service faster. The service was the same as Radio Relay had been performing for subscribers for 20 years signalling a subscriber by means of generating and broadcasting a radio signal authorized and regulated by the Federal Communications Commission.

## II A.

Several propositions of law are advanced by Radio Relay, but the key question, dispositive of this appeal, is

---

you propose to offer a special rate for such service. Under those circumstances Section 4905.31, Revised Code, would require Commission approval.

Very truly yours,

Sally W. Bloomfield

SWB: eof

(Mrs.) Sally W. Bloomfield

Assistant to the Commission

CC:Sheldon Taft

whether a one-way paging service, tone only, such as Radio Relay, interconnected to a land-line telephone, is a "telephone company" engaged in the business of transmitting telephonic messages to, from, through, or in this state, within the meaning of R. C. 4905.03(A)(2), and, as such, a public utility subject to the Public Utilities Commission's jurisdiction under R. C. 4905.02.

This is the first case in Ohio to focus on this issue. Under the above-noted sections of the Revised Code, a public utility includes a telephone company, when engaged in the business of transmitting telephonic messages to, from, through, or in this state, and, as such, is a common carrier, subject to the power and jurisdiction of the Public Utilities Commission to supervise and regulate.

The opinion and order of the commission, dated December 31, 1974, included a finding of fact that:

"(5) The signals transmitted through the respondent's [Radio Relay Corporation] service are, in fact, 'telephonic' messages."

The opinion and order further included as conclusions of law:

"(1) Respondent, Radio Relay Corporation, is a telephone company within the meaning of Section 4905.03(A)(2), Revised Code.

"(2) Respondent, Radio Relay Corporation, is a public utility within the meaning of Section 4905.02, Revised Code."

The commission ordered Radio Relay to make application for a certificate of public convenience and necessity which will authorize the performance of the service which is the subject of the complaint before it.

*II B.*

R. C. 4905.03 reads:

"As used in Sections 4905.01 to 4905.04, inclusive, of the Revised Code:

"(A) Any person, firm, copartnership, voluntary association, joint-stock association, company, or corporation, wherever organized or incorporated, is:

"(* * *

" (2) a telephone company, when engaged in the business of transmitting telephonic messages to, from, through, or in this state and as such is a common carrier."

This definition has remained substantively unchanged since it was adopted by the General Assembly in 1911, when the predecessor agency of the Public Utilities Commission of Ohio, the Public Service Commission of Ohio, was created. That 1911 law defined a telephone company as follows:

"When engaged in the business of transmitting to, from, through, or in this state, telephonic messages, is a telephone company and as such is declared to be a common carrier." (102 Ohio Laws 549, 550.)

Obviously, this definition is the same, except for the transposition of several words, in the present statutory definition. Another related, important fact, however, is that at the same time and in the same section where it defined a telephone company, the 79th General Assembly also defined a company which was known as a "signalling company." The General Assembly said that a "signalling company" is such:

"When engaged in the business of signalling or calling by an electrical apparatus, or in a similar manner, for any purpose * * *." (102 Ohio Laws 549, 551.)

So, when the General Assembly defined "telephone company" in 1911 for the purposes of public utility regulation, it excluded therefrom a "signalling company."

A review of the Annual Reports of the Public Utilities Commission of Ohio from 1911 until 1936 shows during that period that signalling companies were treated separately from telephone companies. Such companies consisted primarily of fire and burglar alarm companies which, on behalf of subscribers to their services, alerted local fire and police departments by automatically transmitting a signal over the interconnected facilities of a telephone company through the signalling company's dispatch office after a fire or unauthorized entry had been detected.

In 1936, the 91st General Assembly eliminated signalling companies from the statutory definition of public

utilities subject to Public Utilities Commission regulation. (S. B. 448, 116 Ohio Laws 309, part 2.) This 1936 amendment made no change in the definition of a telephone company. The only change was the elimination of a "signalling company" from the definition of public utilities subject to Public Utilities Commission jurisdiction. And the commission noted in its report that year that "signalling companies" were no longer under the jurisdiction of the Public Utilities Commission. Accordingly, this court may not resurrect that repealed Public Utility Commission authority over signalling companies by construing it into the surviving section, R. C. 4905.03(A)(2), in the absence of further action by the General Assembly. There have been no subsequent enactments by the General Assembly to restore the jurisdiction of the Public Utilities Commission over signalling companies.

The Public Utilities Commission has only those powers expressly granted by the General Assembly. (*Penn Central Transportation Co.* v. *Pub. Util. Comm.* [1973], 35 Ohio St. 2d 97; *Forest Hills Util. Co.* v. *Pub. Util. Comm.* [1972], 31 Ohio St. 2d 46.)

## II C.

After removing signalling companies from the jurisdiction of the Public Utilities Commission in 1936, the General Assembly did not ignore such companies. In 1949, the 98th General Assembly recognized a "communications business" and distinguished it from the telephone business. Am. S. B. 270 (123 Ohio Laws 444) dealt with the powers and restrictions of telegraph, telephone and *communication companies* and provided, in part:

"Any company heretofore or hereafter organized to transact a telegraph, telephone or *communications business* may construct, reconstruct, own, use, lease, operate, maintain and improve communications systems for the *transmission of* voices, sounds, writings, signs, *signals,* pictures, visions, images or other forms of intelligence, as public utility services, by means of wire, cable, radio, *radio relay* or other facilities, methods or media and for such purposes shall have the powers and be subject to the restrictions

prescribed in Sections 9170 to 9178, inclusive of the General Code. for telegraph and telephone companies.'' (Emphasis added.)

Appellant, Radio Relay, transmits signals by radio relay, and as such is a communications company which must comply with the provisions of R. C. Chapter 4931. However, the General Assembly has never conferred upon the Public Utilities Commission jurisdiction over communications companies as distinguished from telephone companies in R. C. 4931.11. In particular, R. C. 4905.24, which requires that a telephone company secure a certificate of public convenience and necessity to operate, and upon which the commission's opinion and order is based, nowhere mentions communications companies.

In 1967, the Ohio General Assembly also recognized and distinguished communications companies from telephone companies in R. C. Chapter 324, which provides for a local "utilities service tax," which may be levied by counties to raise additional revenue. R. C. 324.01 states:

"(A) Utility means:

"(1) An electric company, gas company, heating company, cooling company, telephone company, telegraph company, or *communications* company supplying a utility service.

"* * *

"(B) Any individual, firm, partnership, association, trust, joint-stock company, joint venture, corporation, municipal corporation, county or other political subdivision, instrumentality, or agency of the state, non-profit corporation, cooperative, receiver, assignee, trustee in bankruptcy, estate, trustee, or organization of any kind:

"* * *

"(5) Is a *telephone company* when transmitting telephonic messages to, from, or within a county levying a utilities service tax;

"(6) Is a *telegraph company* when transmitting telegraphic messages to, from, or within a county levying a utilities service tax;

"(7) Is a *communications company* when *supplying*

*the services described in Section* 4931.11 of the Revised Code, *other than transmitting telephonic or telegraphic messages* to, from, or within a county levying a utilities service tax.'' (Emphasis added.)

Radio Relay receives instructions from calls over the local telephone system but it does not transmit these instructions any further than from its automatic answering device to its dispatching terminal—a distance of several inches. The distance is no further than the space from the former human dispatch operator's ear to her brain where the signals which were received by her ear were translated.

In the present case, the dispatching terminal translates the digital tones received from the local telephone into two different tones generated by the dispatching terminal itself. These two tones are then sent to Radio Relay's transmitter for broadcast to subscriber's pager causing it to emit a beep. Radio Relay does not carry or broadcast any signals other than those generated by itself. Of equal importance, the party with the land-line telephone does not communicate with the subscriber who carries the pager. And, most importantly, the interconnection of Radio Relay with the land-line telephone did not change what Radio Relay was doing, or could do, by way of signalling service. The only change resulting from interconnection was the replacement of a human operator with an automatic answering device. The service provided to the subscriber is exactly the same.

## III.

For the reasons stated above, it is the conclusion of this court, after a careful consideration of the entire record in the light of the applicable statutes, (1) that the commission's finding that ''the signals transmitted through the respondent's service are, in fact, 'telephonic messages' '' is unreasonable and unlawful, (2) that the commission's conclusion of law that ''respondent, Radio Relay Corporation, is a telephone company within the meaning of Section 4905.03(A)(2), Revised Code,'' is unreasonable and unlawful because of the minimal use of telephone company equipment in connection with ''signal-

ling'' Radio Relay's subscribers and, further, because of the total lack of use of telephone company land lines in conjunction with such service of ''signalling,'' and (3) that the commission's conclusion of law that ''respondent, Radio Relay Corporation, is a public utility, within the meaning of Section 4905.02, Revised Code,'' is unreasonable and unlawful.

Accordingly, the order of the Public Utilities Commission is reversed as being unreasonable and unlawful.

*Order reversed.*

O'NEILL, C. J., HERBERT, STERN, CELEBREZZE, W. BROWN and P. BROWN, JJ., concur.