Public Utilities Commission
No. 81-431

## APPEAL OF OMNI COMMUNICATIONS, INC.
### d/b/a PAGE CALL
(New Hampshire Public Utilities Commission)

October 12, 1982

*Ransmeier & Spellman*, of Concord (*Dom S. D'Ambruoso* on the brief and orally), for Omni Communications, Inc.

*Sheehan, Phinney, Bass & Green,* of Manchester (*Richard V. Wiebusch* and *Susan A. Galvin* on the brief, and *Mr. Wiebusch* orally), for Comex, Inc.

DOUGLAS, J. Omni Communications, Inc., appeals from the public utilities commission's (PUC) denial of its petition for permission to tie its radio-paging system into telephone lines in New Hampshire. We hold that the PUC has no authority to regulate the use of radio pagers.

Omni Communications, Inc. d/b/a Page Call (Omni) is a Massachusetts corporation which is attempting to extend its paging or "beeper" service into New Hampshire. A "beeper" system enables a person wishing to contact another person to dial a telephone number which has been assigned by the paging company and is connected with the paging company's terminal equipment. The caller then gives his message over the telephone and hangs up. Thereafter, the terminal equipment transmits a radio signal, which is received by the holder of the paging receiver, or "beeper."

New England Telephone Company refused to "interconnect" Omni's terminal equipment, thereby allowing direct transmission of telephone messages without the assistance of a New Hampshire operator, unless Omni obtained permission from the PUC. Consequently, Omni petitioned the PUC for permission to interconnect its lines and also requested reversal of an earlier order granting Comex, Inc. (Comex) exclusive rights to radio-paging service in most of this State. Following several motions and a hearing, the PUC denied Omni's petition and upheld Comex's exclusive franchise. After the PUC refused Omni's request for a rehearing, Omni appealed to this court. Although there are several procedural issues raised in this appeal, the central issue is whether the PUC is authorized to regulate radio pagers.

New Hampshire first regulated utilities in 1838 by authorizing the appointment of three commissioners in each county, with limited powers, to oversee the location of railroads. Regulation of railroads was transferred from the county to the State level in 1844 with the establishment of the State Board of Railroad Commissioners. In 1911, the public service commission (PSC) replaced the board of railroad commissioners and was granted expanded jurisdiction. In 1951, however, the various statutes pertaining to utility regulation were combined, and the PSC became the PUC. Laws 1951, 203:1.

■■ The legislative intent in establishing the State Board of Railroad Commissioners, the PSC, and ultimately the PUC was to

"find a remedy against the evils of monopoly," thus restoring "healthy competition in the trades and industries." JOURN. OF CONST. CONVENTION OF 1902, 579 (1903). The principal sponsor of a proposed anti-monopoly amendment at the 1902 Constitutional Convention, delegate William Chandler of Concord, observed:

> "The foundation of society is the effort of every individual man to make something of himself in the community in which he lives; and the foundation of national prosperity is the effort of every individual to secure his personal prosperity. Whatever crushes out the individual, whatever keeps down the many striving to get a living, striving to make money, striving to accumulate property, tends in the end to the injury of the whole people."

*Id.* at 497. Therefore, after considerable discussion regarding the evils of monopoly, the convention delegates voted overwhelmingly, 313 to 2, to recommend adoption of a constitutional amendment which would prohibit the growth and expansion of monopolies in this State. "This principle should be asserted in a concrete form so that the legislature of this state, and the legislature of every other state, will understand that it is a principle upon which New Hampshire insists." *Id.* at 563. The amendment read in part as follows: "Free and fair competition in the trades and industries is an inherent and essential right of the people and should be protected against all monopolies and conspiracies which tend to hinder or destroy it." This amendment is now included in the New Hampshire Constitution in part II, article 83 and thus declares our fundamental preference for free enterprise.

The unique nature of gas, railroads, electricity and telephone service, however, as a practical matter, requires the existence of certain monopolies. These constitute examples of what economists would term "natural" monopolies which are countenanced "because technical considerations make it more efficient or economical to have a single enterprise rather than many" competing sets of wires and poles running everywhere. M. FRIEDMAN, CAPITALISM AND FREEDOM 128 (1962). Thus, the legislature, acting in an era of extensive anti-monopolistic fervor, had no choice but to create a commission which would oversee and regulate those sanctioned monopolies. As previously noted, the legislature did this by establishing the State Board of Railroad Commissioners, the PSC, and most recently the PUC. *See Petition of Boston & Maine Corp.,* 109 N.H. 324, 326, 251 A.2d 332, 335 (1969).

The role and duty of such a commission is to oversee and regulate those few necessary monopolies so that the constitutional

rights of free trade and private enterprise are disrupted as little as possible. As this court observed in a PUC case five years ago:

> "Regulatory agencies have come under recent scrutiny in a report this year by the N.H. House Special Committee on Licensing and Regulatory Boards. Its report found that boards may be 'knowingly or unknowingly' raising barriers to entrance into business and may be out of step with legislative intent by being 'protectionist of their trade and limit[ing] competition.' . . . This attitude was found to be 'not in the public interest.' "

*N.E. Household Moving & Storage, Inc. v. Public Util. Comm'n,* 117 N.H. 1038, 1041, 381 A.2d 745, 748 (1977) (citations omitted). In the instant case, the PUC, by attempting to regulate radio pagers, is demonstrating the very behavior it was established to prevent: interference and disruption of free market private enterprise.

A "public utility" is defined to include, among other things, "any plant or equipment or any part of the same for the conveyance of telephone or telegraph messages." RSA 362:2. The legislature in 1977 rejected Senate bill 155 which would have required all mobile telephone service companies and radio-paging service companies doing business in this State to be regulated by the PUC. N.H.S. JOUR. 1854 (1977). Representative Taylor, on behalf of the House Science and Technology Committee, reported that

> "[t]his bill brings under the PUC mobile radio paging companies and would prohibit the granting of an operating certificate in an area where 'competition or duplication' existed. The Committee felt this legislation might stifle competition in a budding new industry and that the last thing the PUC needs at this point is another set of duties to administer."

N.H.H.R. JOUR. 1069 (1977).

■ Given this statutory, legislative, and constitutional history, we conclude that in enacting RSA 362:2 the legislature did not intend to place all companies and businesses somehow related to railroads, telephone, telegraph, light, heat, and power companies under the umbrella of the PUC's regulatory power. *N.E. Household Moving & Storage, Inc. v. Public Util. Comm'n,* 117 N.H. at 1041, 381 A.2d at 748; *Allied N.H. Gas Co. v. Tri-State Gas & Supply Co.,* 107 N.H. 306, 308, 221 A.2d 251, 253 (1966); *see Ram Broadcasting of Michigan, Inc. v. Michigan Public Service Commission,* 317 N.W.2d 295, 299–300 (Mich. 1982).

This analysis is consistent with that of the office of the attorney

general when confronted with the question of whether RSA 362:2 sweeps within its scope a community microwave tower that receives television signals but then transmits them by cable over wires of regulated telephone companies:

> "The transmission of television signals by cable, after interception by microwave towers, is not, as such, within the scope of the statute making specific kinds of services subject to commission regulation. If the wires of a telephone company are used for television transmission by a community antenna company, the commission has jurisdiction to regulate rates and services just as it would for any other service of the telephone company. But the jurisdiction is over the telephone company, not over the antenna company."

1 N.H. Op. Att'y Gen. 40, 42 (1965).

No need apparently exists for the PUC directly to regulate radio-paging services. The PUC, by regulating telephone lines, insures the public that the radio-paging industry is not totally unregulated. *See* N.H.H.R. JOUR. 1069 (1977). Additionally, the Federal Communications Commission, through its authority over radio frequencies, has regulatory power over the radio-paging companies that increasingly are involved in interstate commerce. *See National Paging Network is Formed*, Boston Globe, July 19, 1982, at 35.

Because we cannot conclude that the legislature ever intended to grant the PUC authority over radio-paging companies, we vacate the PUC's exercise of jurisdiction over Omni. *Accord, Complaint of Cincinnati Radiotelephone Sys., Inc.*, 45 Ohio St. 2d 121, 341 N.E.2d 826 (1976). Having concluded that the PUC does not have the authority to refuse Omni permission to interconnect its service in this State, we see no reason to address the other issues presented in this appeal.

*Reversed.*

All concurred.