Public Utilities Commission
No. 84-173

### APPEAL OF NEW ENGLAND CABLE TELEVISION ASSOCIATION
(New Hampshire Public Utilities Commission)

February 21, 1985

*Orr & Reno P.A.*, of Concord (*Thomas D. Rath* and *Mary N. Wilke* on the brief, and *Mr. Rath* orally), for the New England Cable Television Association.

*Ransmeier & Spellman*, of Concord (*Dom S. D'Ambruoso* and *Joseph S. Ransmeier* on the brief, and *Mr. D'Ambruoso* orally), for Concord Electric Company.

BROCK, J. The issue in this appeal is whether the New Hampshire Public Utilities Commission (PUC) has authority to regulate the rates, terms, and conditions for attachments made by cable television companies to poles owned or controlled by public utilities. The PUC, in a two-to-one decision, ruled that it did have such authority. For the reasons that follow, we reverse.

The procedural history of this case is brief. Concord Electric Company (the Company) in August, 1983, petitioned the PUC for an order certifying to the Federal Communications Commission (FCC)

that the PUC regulates the rates, terms and conditions for pole attachments, and that in so doing it has authority to consider, and does consider, the interests of the subscribers of cable television services. The New England Cable Television Association (NECTA) intervened by filing an objection to the petition.

After a hearing, the PUC granted the petition on January 27, 1984, with one commissioner dissenting. It later denied NECTA's motion for a rehearing, but stayed the certification order pending this appeal.

The background of the case is more complex. The cable television industry, throughout its existence, has made agreements to attach its cables and other equipment to poles owned or controlled by public utilities. As the number of these agreements increased rapidly during the 1970's, the need for government regulation of the rates, terms and conditions of cable television attachments became apparent.

In 1978, the United States Congress enacted legislation giving the FCC authority to "regulate the rates, terms, and conditions for pole attachments," 47 U.S.C.A. § 224(b)(1) (West Supp. 1984), except "where such matters are regulated by a State." 47 U.S.C.A. § 224(c)(1) (West Supp. 1984). The statute further provides:

> "(2) Each State which regulates the rates, terms, and conditions for pole attachments shall certify to the [FCC] that—
>
> (A) it regulates such rates, terms, and conditions; and
>
> (B) in so regulating such rates, terms, and conditions, the State has the authority to consider, and does consider the interests of the subscribers of cable television services, as well as the interests of the consumers of the utility services."

47 U.S.C.A. § 224(c)(2) (West Supp. 1984).

Prior to 1979, the PUC regulated attachment agreements only to the extent of requiring that such agreements be filed with the PUC. In 1979, the State legislature rejected a proposed bill, HB 610, that would have conferred on the PUC precisely the authority contemplated by the federal statute. While the bill was under consideration, Bruce Ellsworth, the PUC's chief engineer, wrote a letter to the FCC purporting to certify that the PUC did already regulate pole attachments. At NECTA's request, the FCC sought clarification of the letter.

Mr. Ellsworth replied that, while the PUC had in fact regulated pole attachment agreements as a matter of practice, it had "no current statutory authority to specifically consider the interests of the

subscribers of cable television services." As a result, the FCC deleted New Hampshire from the list of States that regulate pole attachments.

In late 1980 or early 1981, the PUC requested an opinion from the New Hampshire Attorney General as to whether it had authority to regulate pole attachments. The response was an informal opinion by an assistant attorney general, dated January 5, 1981. It stated that the PUC had no such authority, and included a draft of proposed legislation that would provide the authority.

Shortly thereafter, a bill essentially similar to the 1979 bill, HB 531, was rejected by the 1981 legislature, despite Chief Engineer Ellsworth's testimony in its favor. The committee report recommending the bill's defeat stated that "there was no need to start a new regulatory practice in New Hampshire on pole attachments . . . ." N.H.H.R. JOUR. 422 (1981).

There was one additional pertinent development prior to the instant case. On May 1, 1981, nine days after the defeat of HB 531, the PUC formally granted a petition by a public utility for a temporary rate increase. *Re Public Service Company of New Hampshire*, 66 N.H.P.U.C. 178 (1981). The order stated that the increase was justified by two factors: "the state franchise tax and expenses associated with cable television rentals of poles." *Id.* at 180.

After a discussion of the franchise tax, the order continued:

> "Another aspect increasing electric rates is the widening differential between the expenses associated with cable television pole attachments and the revenues derived from the rental fees charged. The fees are set by the Federal Communications Commission (FCC) and as is typical of federal regulations, it is slow in responding to changed economics. The expenses associated with maintaining poles has [sic] risen, yet the pole rental revenue collected from cable television companies has remained stationary. If these expenses are not reflected by an increase in pole rental revenue, the electric consumer pays and thereby subsidizes the cable television customer . . . .
>
> This situation could have been remedied by passage of House Bill 531 which [would] have transferred authority for setting pole rental rates from the FCC to this commission. Public Service Company of New Hampshire estimated that the failure of pole rental revenues to match expenses has cost ratepayers $311,630. When similar figures are compiled for the other electric utilities and the 12 telephone utilities, a major subsidy for the cable television industry emerges . . . .

> Hopefully the legislature will act to remove these two barriers [the franchise tax and inadequate pole rental revenues] which together would lower rates by approximately $5.5 million."

*Id.* at 180–81 (footnote omitted).

This clearly indicates that the PUC, in 1981, implicitly accepted the thesis that it lacked authority to regulate pole attachments, within the meaning of 47 U.S.C.A. § 224 (West Supp. 1984). There would be no need to "transfer" authority to the PUC if it already had such authority, nor would there be any "barrier" for the legislature to remove.

Notwithstanding all this, the PUC acted in this case in January, 1984, by ruling that it has always possessed authority to regulate pole attachments, and that it is authorized to consider, and does consider, the interests of cable television subscribers when it does so. The PUC makes no reference in its report to the 1981 *Public Service* decision, saying instead that "this is our first formal decision regarding this issue." PUC Supplemental Order No. 16,930, at 6 (denying NECTA's motion for rehearing). It dismisses the Ellsworth letters and the attorney general's opinion as "inappropriate," and the legislative rejection of HB 610 and HB 531 as "inconclusive."

Our holding in this case does not, however, rest on these factors, but on our interpretation of the statutes which constitute the only source of the PUC's authority. *See State v. New Hampshire Gas & Electric Co.,* 86 N.H. 16, 29, 163 A. 724, 731 (1932). Whatever else those statutes may do, they cannot be construed to authorize the PUC to consider the interests of cable television subscribers, within the meaning of the federal statute.

■ Our analysis is founded on the principle that, even when a statute "delegates broad regulatory powers to the Public Utilities Commission . . . its powers are necessarily circumscribed by the purposes which the statute seeks to accomplish." *Allied N.H. Gas Co. v. Tri-State Gas Co.,* 107 N.H. 306, 308, 221 A.2d 251, 253 (1966).

All of the statutes cited in support of the Company's argument deal with the PUC's power to regulate public utilities. *See, e.g.,* RSA chapters 362 and 378. We have held that, when defining "public utility" in RSA 362:2, "the legislature did not intend to place all companies and businesses somehow related to railroads, telephone, telegraph, light, heat, and power companies under the umbrella of the PUC's regulatory power." *Appeal of Omni Communications, Inc.,* 122 N.H. 860, 863, 451 A.2d 1289, 1291 (1982); *cf. N.H. Pub. Util. Comm'n v. Naughton,* 118 N.H. 750, 394 A.2d 311 (1978).

All parties here concede that cable television companies are not public utilities. The PUC's engaging in the regulatory process proposed here would require it to consider the interests of cable television subscribers, a group whose interests are wholly unrelated to those of the group whose protection, under the current statutory scheme, is the PUC's primary concern—consumers of electricity and other specifically defined utility services. *Cf. Petition of the N.H. Gas & Electric Co.*, 88 N.H. 50, 57, 184 A. 602, 607 (1936); *see generally Appeal of Omni Communications, Inc. supra.*

RSA 378:10, cited by the PUC in support of its holding, merely provides that a public utility shall not give any "unreasonable preference or advantage to any person" in providing services or setting rates. To construe this to support the entrance by the PUC into an entirely new field of regulation is to distort the statute beyond all recognition. The statute directs utilities to treat all consumers of their services equally. It says nothing, either expressly or by implication, about the process contemplated by the federal statute: balancing the interests of consumers against the interests of another discrete group such as cable television subscribers. Only new legislation could give the PUC authority to engage in such a process.

■ We accordingly hold that the PUC has no authority under present law to consider the interests of cable television subscribers. Because the proposed certification order has no current statutory basis, the Company's petition should have been denied.

*Reversed.*

SOUTER, J., did not sit; the others concurred.