Public Utilities Commission
No. 95-420

## APPEAL OF PAUL E. ZIMMERMAN
### (New Hampshire Public Utilities Commission)
January 31, 1997

*Hall, Morse, Anderson, Miller & Spinella, P.C.*, of Concord (*Frank P. Spinella, Jr.* on the brief and orally), for Paul E. Zimmerman.

*Jeffrey R. Howard*, attorney general, and *Amy L. Ignatius*, general counsel of the Public Utilities Commission (*Wynn E. Arnold*, assistant attorney general, and *Ms. Ignatius* on the brief, and *Mr. Arnold* orally), for the State, as *amicus curiae*.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Frederick J. Coolbroth* and *Anu R. Mullikin* on the brief, and *Mr. Coolbroth* orally), for Granite State Telephone, Inc., as *amicus curiae*.

BRODERICK, J. Paul E. Zimmerman appeals an order of the New Hampshire Public Utilities Commission (PUC. or commission) declaring that because Zimmerman offers his tenants telecommunications services, he is operating a public utility within the meaning of RSA 362:2 (1995) and is, therefore, within the commission's jurisdiction. We reverse.

I

Zimmerman owns and manages several commercial buildings in Wolfeboro. These buildings are clustered near one another. Approximately fifty-six commercial and retail tenants occupy space in four of these buildings. In addition, Zimmerman leases space to "transient tenants" who need small offices for a few hours or days; these tenants are typically business people or professionals vacationing in the Lakes Region. Zimmerman offers all his tenants telephone services, which at least twenty-two long-term tenants have purchased. In 1994, the PUC ordered Zimmerman "to show cause why he should not be subject to civil sanctions or criminal prosecution for operating a public telecommunications utility without Commission authorization." The commission held hearings on the matter and reported the following facts.

Zimmerman offers what is known as shared tenant services (STS). To provide STS, Zimmerman owns and operates a digital Mitel SX200 switch, a type of private branch exchange (PBX). He aggregates his tenants' telephone traffic through privately owned lines from each leased space to the PBX. The telecommunications traffic is then routed to the public switched network owned and operated by New England Telephone and Telegraph Company, Inc. d/b/a NYNEX. For NYNEX's purposes, all of the traffic routed through Zimmerman's PBX is attributed to Zimmerman. Consequently, the rates NYNEX charges Zimmerman are based upon the aggregate volume of all of Zimmerman's telephone service customers, allowing Zimmerman to take advantage of NYNEX's discounted rates provided to high volume toll users. Zimmerman's telecommunications network also allows him to resell basic exchange service.

Among the network services Zimmerman offers are local service, intrastate and interstate long distance service, voice mail, call accounting, bulletin boards, call rerouting, and call conferencing. Tenants within Zimmerman's office complexes may also call one another without accessing NYNEX's public switched network. Tenants may lease premises equipment, including telephones and facsimile machines, from Zimmerman. He charges tenants fixed line fees for basic telephone service and equipment rental fees for the customer premises equipment. These fees are generally included in the tenant's real estate lease.

In connection with the operation of his PBX, Zimmerman has reserved a number of direct inward dial (DID) telephone numbers with NYNEX. He assigns these telephone numbers to his tenants who desire individual numbers for their businesses. These numbers

are not portable: Zimmerman's tenants cannot take their DID telephone numbers with them should they leave Zimmerman's office space and relocate within the Wolfeboro exchange.

The commission ruled that Zimmerman is a public utility, and ordered Zimmerman to disclose to his tenants: (1) the average rate per minute he charges; (2) that billing would be computed on a per-minute basis beginning with the first ring, even if a call is not answered; and (3) that in the future telephone numbers would be portable if tenants relocated within the calling area. Though there was some dispute about whether Zimmerman's tenants had an opportunity to select an alternative telephone services provider, the commission nonetheless ordered Zimmerman to inform existing and prospective tenants that they could choose an alternative provider. On the basis of the record before it, the commission concluded that STS had value and that rate of return regulation would be inappropriate. The commission also opened a separate docket to explore fully whether STS is in the public interest and, if so, the appropriate degree to which it should be regulated. The commission did not fine Zimmerman or require him to cease operations; it did, however, require him to file "a tariff setting forth his rates and the terms and conditions of service."

## II

On appeal, Zimmerman argues, among other things, that the commission erred in concluding that he is subject to its jurisdiction. "A party seeking to set aside or vacate an order of the PUC has the burden of demonstrating that the order is contrary to law or, by a clear preponderance of the evidence, that the order is unjust or unreasonable." *Appeal of Public Serv. Co. of N.H.*, 141 N.H. 13, 16, 676 A.2d 101, 103 (1996); *see* RSA 541:13 (1974). We presume the commission's findings of fact to be lawful and reasonable. *See Appeal of Public Serv. Co. of N.H.*, 141 N.H. at 16, 676 A.2d at 103.

█ The question before us is one of statutory construction. The commission has "general supervision of all public utilities," RSA 374:3 (1995), which include "every corporation, company, association, joint stock association, partnership and person . . . owning, operating or managing any plant or equipment or any part of the same for the conveyance of telephone or telegraph messages . . . for the public," RSA 362:2. As the PUC noted in its order, Zimmerman "does not contest that he owns, operates and manages plant and equipment for the conveyance of telephone messages." Accordingly, the dispute in this case turns on the definition of the term "public."

A

We have previously considered the definition of "public" in the regulatory context. In *Dover, Somersworth and Rochester Street Railway Co. v. Wentworth*, 84 N.H. 258, 149 A. 505 (1930), the plaintiff sought to enjoin the defendant Wentworth from transporting the defendant plant's employees by "motor bus" between Dover and the plant in Somersworth, arguing that Wentworth was a "common carrier" subject to the laws governing such carriers. *See id.* at 258-59, 149 A. at 505. Noting that the "[o]ne essential characteristic" of a common carrier "is the carriage of the public generally," the court concluded Wentworth was not a common carrier: "The service offered and performed by him is not to the public but is expressly found to be special and exclusive, limited to the transportation of these defendant corporation's employees only." *Id.* at 260, 149 A. at 506 (quotation and brackets omitted).

The court relied upon this reasoning in *Claremont Gas Light Co. v. Monadnock Mills*, 92 N.H. 468, 32 A.2d 823 (1943), in which it addressed the question whether the defendant mill was "a public utility within the meaning of the statutes relating to public utilities." *Id.* at 468, 32 A.2d at 824 (quotation omitted). The defendant furnished steam to the plaintiff and to another corporation, but it "never solicited the sale of steam by advertisement or otherwise and, on several occasions, . . . refused to furnish steam to a local laundry." *Id.* at 469, 32 A.2d at 824. The defendant never filed rates or reports with the PUC or "sought or obtained any franchise to engage in business as a steam public utility." *Id.* The plaintiff petitioned the PUC to require the defendant to furnish it steam "at reasonable rates." *Id.* at 468, 32 A.2d at 824.

At the outset, the court explained:

> Service to the public without discrimination is one of the distinguishing characteristics of a public utility, and, except as modified by statute, it is the general rule that unless a person has publicly professed his readiness to perform a particular service he is under no duty to render that service to all who request it.

*Id.* at 469-70, 32 A.2d at 824 (citations omitted). Reviewing the facts, the court observed that the defendant never undertook "generally to furnish steam at reasonable rates to all who apply therefor"; rather, this service was "purely voluntary and at prices fixed in each case by special contract." *Id.* at 470, 32 A.2d at 825 (quotations and citation omitted). Because the steam was not ultimately sold to the

public, the court concluded that the defendant was not a public utility within the PUC's purview. *See id.*

■ The *Monadnock Mills* court articulated the general rule: a distinguishing characteristic of a public utility is "[s]ervice to the public without discrimination." *Id.* at 469, 32 A.2d at 824. An enterprise is necessarily private if the service provider has a relationship with the service recipient, apart from the service provision itself, that is sufficiently discrete as to distinguish the recipient from other members of the relevant public; this is the "discrimination" that separates public utilities from private. *See* 73B C.J.S. *Public Utilities* § 3, at 130-31 (1983). In *Monadnock Mills*, for example, the service provider and each of the service recipients enjoyed a lessor-lessee relationship. *See Monadnock Mills*, 92 N.H. at 469, 32 A.2d at 824. The provider thus was not furnishing its services to an undifferentiated public; consequently, it was not subject to regulation by the commission. *See id.* at 471, 32 A.2d at 825.

B

In its order in Zimmerman's case, the PUC questioned the continued vitality of our holdings in *Wentworth* and *Monadnock Mills*. The commission expressed doubt as to whether "the broad statements relative to [its] jurisdiction expressed [in those cases] remain viable statements of the law in this State." In support of this assertion, the PUC cited our decision in *Allied New Hampshire Gas Co. v. Tri-State Gas & Supply Co.*, 107 N.H. 306, 221 A.2d 251 (1966), as well as legislative additions to RSA 362:2 which, the commission claimed, alter the construction that should be given the term "public."

The PUC's belief that *Allied New Hampshire Gas* displaced our holdings in *Wentworth* and *Monadnock Mills* is unfounded. The issue in *Allied New Hampshire Gas* was whether the defendant's distribution and sale of liquefied petroleum gas rendered it a public utility. *See Allied N.H. Gas Co.*, 107 N.H. at 307, 221 A.2d at 253. Though the liquefied petroleum operation was "public" in the literal and traditional sense of the term, still the court concluded it was not subject to the commission's jurisdiction because regulation of these services was not among the statute's stated or implied objectives. *See id.* at 308-09, 221 A.2d at 253-54. Rather than supplanting *Wentworth* and *Monadnock Mills*, the *Allied New Hampshire Gas* court simply affirmed the principle that, notwithstanding the com-mission's broad regulatory mandate, "its powers are necessarily circumscribed by the purposes which the statute seeks to accom-

plish." *Allied N.H. Gas Co.*, 107 N.H. at 308, 221 A.2d at 253; *see also Appeal of N.E. Cable Television Assoc.*, 126 N.H. 149, 152, 489 A.2d 124, 126 (1985).

In fact, both this court and the PUC have applied the principles established in *Wentworth* and *Monadnock Mills* since the *Allied New Hampshire Gas* decision. In *New Ipswich Electric Lighting Department v. Greenville Electric Lighting Co.*, 108 N.H. 338, 235 A.2d 833 (1967), we upheld the PUC's determination that a landlord who supplied its tenant with electricity "could not be found to be a public utility, because it was not engaged in selling electricity to the public." *Id.* at 340, 235 A.2d at 834. More recently, the commission applied these principles in *Re Plymouth State College*, 75 N.H.P.U.C. 65 (1990), in which it ruled that the provision of telecommunications services to students, faculty, administrators, and employees of a college was not the operation of a public utility within the meaning of RSA 362:2. *See Plymouth State College*, 75 N.H.P.U.C. at 66-67.

Nor does the PUC's skepticism about our holdings in *Wentworth* and *Monadnock Mills, see Plymouth State College*, 75 N.H.P.U.C. at 67, find support in legislative additions to RSA chapter 362. In *Appeal of Omni Communications*, 122 N.H. 860, 451 A.2d 1289 (1982), we recounted the history of the commission and public utilities regulation. The State assumed responsibility for regulating railroads in 1844; in 1911, "the public service commission (PSC) replaced the board of railroad commissioners and was granted expanded jurisdiction. In 1951, however, the various statutes pertaining to utility regulation were combined, and the PSC became the PUC." *Id.* at 861, 451 A.2d at 1290. The statutory language at issue in this case has remained essentially unchanged since 1951:

> The term "public utility" shall include every corporation, company, association, joint stock association, partnership and person . . . owning, operating or managing any plant or equipment or any part of the same for the conveyance of telephone or telegraph messages . . . for the public, or . . . sale of electricity ultimately sold to the public.

RSA 362:2.

In 1987, the legislature enacted RSA 362:3-a (1995), which provides that the term "sale," as used in RSA 362:2, "shall not include electric submetering in campgrounds for the purpose of calculating reimbursable amounts among submeter users." The legislature apparently enacted this statute in response to the PUC's decision in *Echo Valley Campground v. Public Service Company of New Hampshire*, 71 N.H.P.U.C. 211 (1986), in which the commission

determined that campground owners were engaged in the "sale of electricity ultimately sold to the public." *Id*. at 214 (emphasis and quotation omitted). In addition, the legislature in 1989 adopted the current form of RSA 362:4, I (1995), which provides that when a water or sewage disposal system supplies "a less number of consumers than 10, . . . the commission may exempt any such water or sewer company from any and all provisions of this title whenever the commission may find such exemption consistent with the public good."

According to the commission, RSA 362:3-a represents a presumption by the legislature "that RSA 362:2 mandated the regulation of submetered electric service in campgrounds." The commission similarly reasons that RSA 362:4, I, signifies a legislative presumption that RSA 362:2 "requires the regulation of all water utilities, even those serving less than ten customers." In short, the PUC regards these enactments as implicit recognition by the legislature that the term "public" in RSA 362:2 means something other than the undifferentiated "public" as explained in *Wentworth* and *Monadnock Mills*. In the commission's view, if "public" did not have this broader meaning, the 1987 and 1988 enactments would not have been necessary.

We do not share the commission's understanding of the statutory additions to RSA chapter 362. The silent assumptions the legislature entertained when it enacted RSA 362:3-a and RSA 362:4, I, matter little to our analysis; what is important for our purposes is the statutory language itself, for we construe the legislature's intent from the statute as written, and "we will not consider what the legislature might have said or add words that the legislature did not include." *Petition of Walker*, 138 N.H. 471, 474, 641 A.2d 1021, 1024 (1994).

By their plain language, neither RSA 362:3-a nor RSA 362:4, I, explicitly amends RSA 362:2 or modifies the term "public" as it is used in that provision. Moreover, neither enactment is incompatible with the analysis of "public" expressed in *Wentworth* and *Monadnock Mills*: RSA 362:3-a simply modifies the term "sale" in cases involving electric submetering in campgrounds, while RSA 362:4, I, allows the commission to exempt otherwise public water and sewage utilities from regulation when the number of consumers is fewer than ten. Accordingly, we cannot say that either enactment represents a clear expression of legislative intent to alter the construction of "public" to which this court and, indeed, the PUC, *see Plymouth State College*, 75 N.H.P.U.C. at 67, have traditionally adhered.

## C

It remains to apply the principles articulated in *Wentworth* and *Monadnock Mills* to this case. As explained above, the central inquiry is whether Zimmerman offers his telecommunications services to the public without discrimination. *See Monadnock Mills*, 92 N.H. at 469, 32 A.2d at 824; *Wentworth*, 84 N.H. at 260, 149 A. at 506. To this end, we consider whether Zimmerman enjoys an underlying relationship with those persons who use his services that is sufficiently discrete as to differentiate them from other members of the relevant public.

█ In this case, such a relationship exists. To avail themselves of Zimmerman's STS network, members of the public must establish a landlord-tenant relationship with Zimmerman by renting space from him on either a long- or short-term basis. Zimmerman's telecommunications services are thus incidental to and contingent upon his tenants' status as tenants. Just as access to Plymouth State College's telecommunications network was limited to those persons with whom the college had discrete relationships, be it landlord-tenant or employer-employee, *see Plymouth State College*, 75 N.H.P.U.C. at 66-67, so, too, access to Zimmerman's STS network is restricted to those persons with whom he has a landlord-tenant relationship. Because Zimmerman does not share this affinity with other members of the relevant public, he cannot be said to offer telecommunications services to all comers without discrimination. His STS network, therefore, is not a public utility within the commission's jurisdiction under RSA 362:2.

## III

In its order, the commission emphasized the need to regulate Zimmerman's STS and, presumably, other STS systems, for the benefit of consumers. We note that consumer remedies are available should any of Zimmerman's tenants feel wronged by his practices. *See* RSA ch. 358-A (1995) (consumer protection). Moreover, the question whether regulating Zimmerman's STS is desirable is a consideration wholly apart from the determination whether Zimmerman is subject to regulation by the PUC under existing law. The desirability of permitting such regulation is, in the first instance, a matter for the legislature, *see Allied N.H. Gas Co.*, 107 N.H. at 309, 221 A.2d at 254, for it is not this court's role to extend

the commission's authority into areas not contemplated by the statute.

*Reversed.*

HORTON, J., dissented; the others concurred.

HORTON, J., dissenting: I would hold that the New Hampshire Public Utilities Commission (PUC) was correct in asserting jurisdiction over Mr. Zimmerman and well within its discretion to issue the limited regulatory orders in this case. The issue in this case is one of statutory interpretation. *Allied N.H. Gas Co. v. Tri-State Gas Co.*, 107 N.H. 306, 307, 221 A.2d 251, 253 (1966). The interpretive context involves a statute, RSA 362:2 (1995), delegating broad regulatory powers. *Id.* at 308, 221 A.2d at 253. These regulatory powers necessarily are "circumscribed by the purposes which the statute seeks to accomplish." *Id.* A correct analysis of the propriety of applying the statutory grant, therefore, involves deciding whether the service in question falls within the categories listed for regulation, and whether regulation is appropriate to carry out the purposes for which the grant of regulatory power is made. *See id.* at 308-09, 221 A.2d at 253-54. It is clear that any statutory purpose divined must relate to the public, a private contractual service not being within the scope of the purpose. And that is the contest before us in this case. Is the admitted utility "public" for the purposes of delegated regulation?

The question is a close one under the facts of this case. Since the PUC has asserted regulatory jurisdiction, since Mr. Zimmerman has the burden to demonstrate that the order is illegal (not within PUC jurisdiction), and since we afford a presumption of legality to the findings of the PUC, *see Appeal of Public Serv. Co. of N.H.*, 141 N.H. 13, 16, 676 A.2d 101, 103 (1996), the fine "public" line should be drawn on the side of jurisdiction. The majority holds that the service is not "public" because Mr. Zimmerman enjoys an underlying relationship with those persons who use his services that is sufficiently discrete as to differentiate them from the immediate public. The relationship relied upon is that of landlord and tenant. This test for exemption from statutory regulation of a service is far too broad.

I agree that some forms of relationship, including some forms of relationship based on a status of landlord and tenant, may dictate that a denominated service provided by one in a relationship to another is uniquely private. But the relationship must contain elements that eliminate the need for regulation, that allow the purpose of the statute to be met. The statutory scheme defines the

type of services that require regulation. It calls for assurance that the service be "reasonably safe and adequate and in all other respects just and reasonable," RSA 374:1 (1995), specifically calling for just and reasonable charges. RSA 374:2 (1995). It gives the public the benefit of this regulation. The public to be protected are those who will be offered the service. If the public is offered accommodation in a landlord's facilities, it is offered the service. For the offer of service to be privatized, there must be something more than a mere landlord-tenant relationship. Many landlords have extensive holdings comprising large portions of the available rental market. These holdings may be geographically dispersed and unrelated in regard to use. In these cases, relationship should not foreclose regulation.

Mr. Zimmerman offered his services to a number of rental units in separate buildings on different lots. There was no community of use in the operations of the tenants. Nor was there any continuing relationship between Mr. Zimmerman and his *ad hoc*, hot seat, partial chair customers. The PUC was alerted to, and found, violations of the "just and reasonable" requirements in Mr. Zimmerman's delivery of the service. It was correct in asserting jurisdiction.

So, how should the private nature exemption be applied under our law? First, the public-private distinction should be applied at the relationship level, not at the service level. Is the relationship available to the public? If so, then the provision of the service will be to the public unless the relationship necessarily involves an affinity that incorporates the service, *Dover &c. Ry. Co. v. Wentworth*, 84 N.H. 258, 260, 149 A. 505, 506 (1930); *Re Plymouth State College*, 75 N.H.P.U.C. 65, 67 (1990), or there is symbiotic use leading to a limited practical contractual relationship. *Claremont &c. Co. v. Mills*, 92 N.H. 468, 470-71, 32 A.2d 823, 825 (1943).

It should also be noted that the PUC's order is very limited in scope and is based on a holding theory, pending the completion of generic proceedings on shared tenant services under which the PUC may draw appropriate lines of jurisdiction and procedures for regulation. The majority opinion appears to validate all shared tenant services, a move contrary to desirable administrative regulation.