Public Utilities Commission
Nos. 91-331
 91-337

## APPEAL OF NORTHERN UTILITIES, INC.

## APPEAL OF ENERGYNORTH NATURAL GAS, INC.
### (New Hampshire Public Utilities Commission)

December 3, 1992

450

*Ransmeier & Spellman*, of Concord (*Dom S. D'Ambruoso* and *R. Stevenson Upton* on the brief), and *LeBoeuf, Lamb, Leiby & MacRae*, of Boston, Massachusetts (*Elias G. Farrah* and *Scott J. Mueller* on the brief, and *Mr. Farrah* orally), for Northern Utilities.

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Richard A. Samuels* and *Mark C. Rouvalis* on the brief), and *Jacqueline Lake Killgore*, corporate counsel, orally, for EnergyNorth Natural Gas, Inc.

*John P. Arnold*, attorney general (*Harold T. Judd*, senior assistant attorney general, on the brief and orally), and *Amy L. Ignatius*, general counsel for New Hampshire Public Utilities Commission, on the brief, for the State as *amicus curiae*.

American Gas Association (*Miriam Swydan Pedersen* and *David J. Muchow* on the brief), by brief as *amicus curiae*.

THAYER, J. Northern Utilities, Inc. (Northern) and Energy-North Natural Gas, Inc. (EnergyNorth) appeal from orders of the

New Hampshire Public Utilities Commission (PUC), in which the PUC determined that certain costs would not be "passed through" to retail natural gas consumers (ratepayers). The PUC ordered both Northern and EnergyNorth to absorb 40 percent of these costs, while allowing 60 percent of the costs to be passed through. Northern and EnergyNorth appeal. We hold that federal legislation preempts the PUC from allowing anything less than 100% allocation of the costs at issue to Northern and EnergyNorth ratepayers because the Federal Energy Regulatory Commission (FERC) had approved these costs as part of the wholesale rate of natural gas. Therefore, we vacate the PUC's order.

This case has its genesis in orders of the FERC intended to restructure the natural gas industry to make it more competitive. The natural gas industry is comprised of four distinct groups: natural gas producers, interstate pipeline owners (pipelines), local distribution companies (LDCs), and retail ratepayers. Northern Utilities and EnergyNorth are LDCs. Pipelines transport gas interstate from the producers to the LDCs, and LDCs transport gas from the pipelines to retail consumers. Before the restructuring, LDCs purchased their gas supplies almost exclusively from the pipelines, which acted both as wholesale buyers from the producers and as wholesale sellers to the LDCs. The pipelines entered into long-term contracts with producers, and these contracts often contained "take-or-pay" clauses. Under a take-or-pay clause, a pipeline agreed to pay for a minimum amount of gas each year, regardless of whether the pipeline had taken the minimum amount.

The costs at issue in this appeal arise from the restructuring of the natural gas industry. In 1985, the FERC issued an order providing for "open access" transportation whereby pipelines would allow LDCs to purchase gas directly from the producer and pay a charge for the pipelines' transportation of the gas from the producer to the LDC. *See generally* Order No. 436, 50 Fed. Reg. 42408; 50 Fed. Reg. 45907 (1985). This open access policy caused the pipelines to have two roles in the market for natural gas; in addition to acting as a "middleman" by selling gas to LDCs, the pipelines also acted as conduits for gas that LDCs purchased directly from the producers. Because LDCs could purchase lower cost gas directly from the producers, the pipelines' "middleman" sales decreased. As sales to LDCs decreased, the pipelines' take-or-pay obligations rose because they were still required to pay producers for the minimum annual amount under their long-term contracts.

Before the restructuring described above, pipelines were allowed to recover costs related to acquisition of gas supplies through commodity rates, by adding their costs to the price of gas to be sold in the future by the pipeline. If the FERC determined that the pipeline was prudent in incurring costs, the pipeline was allowed to pass through 100% of its costs in the wholesale rate paid by LDCs. In response to mounting take-or-pay costs, reaching $24 billion by 1987, the FERC issued another order providing that take-or-pay costs were related to the acquisition of gas and could be recovered through commodity rates. Order No. 500-H, 54 Fed. Reg. 52344, 52348 (1989). The FERC also proposed an alternate method for pipelines to recover take-or-pay settlement costs without undergoing a prudency review. Order No. 500, 52 Fed. Reg. 30334, 30341 (1987). Under the "equitable sharing mechanism" alternative, if a pipeline agrees to absorb 25-50 percent of the take-or-pay costs, it is allowed to recover an equal percentage through a fixed charge. Any remainder may be recovered through a volumetric surcharge on all gas transported through the pipelines to the LDCs. *Id.* at 30341–43.

In the case before us, the pipeline servicing the LDCs, Northern and EnergyNorth, is Tennessee Gas, the only pipeline to serve New Hampshire. In 1990, the FERC accepted a proposal from Tennessee Gas in which it would voluntarily absorb 50 percent of its take-or-pay liability and recover 50 percent from LDCs through direct billing based on each LDC's annual quantity limitation. The wholesale rate charged by Tennessee Gas, including the take-or-pay costs that were passed through, was filed with the FERC. Under this FERC-approved wholesale rate, the PUC determined that Tennessee Gas passed through $723,696 in take-or-pay costs to Northern and $4.4 million to EnergyNorth.

Both Northern and EnergyNorth petitioned the PUC for a cost of gas adjustment to pass through the take-or-pay costs to ratepayers. The PUC did not dispute the fact that both LDCs were prudent in incurring the wholesale costs of Tennessee Gas. By a 2–1 vote, the PUC determined that 60 percent of the costs should be allocated to ratepayers and 40 percent to the utilities. Commissioner Ellsworth dissented on the ground that state commissions must allow LDCs to recover, through retail rates, the wholesale costs established by the FERC. Both LDCs filed motions for rehearing, which were denied, and both filed a notice of appeal with this court. We ordered consolidation of the appeals.

The Natural Gas Act (NGA), 15 U.S.C.A. §§ 717 *et seq.* (1976 & Supp. 1992), is "recognized as a comprehensive scheme of federal

regulation of all wholesales of natural gas in interstate commerce." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988) (quotations omitted). The NGA granted the FERC "exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale." *Id.* at 300–01. The FERC's jurisdiction extends solely to pipelines and the wholesale rates charged by such pipelines. Under the NGA, pipelines are required to file rate schedules with the FERC, 15 U.S.C.A. § 717c(c), which will allow the rate or charge only if it is "just and reasonable." 15 U.S.C.A. § 717c(a). State agencies have the authority to regulate the retail rate charged for natural gas; in New Hampshire, the PUC sets rates for natural gas pursuant to RSA 378:7.

Because of the potential conflict between the federal and state rate-setting authority, the "filed rate doctrine" was developed in the federal court system. Under this doctrine, "interstate power rates filed with FERC or fixed by FERC must be given binding effect by State utility commissions determining intrastate rates." *Nantahala Power & Light v. Thornburg*, 476 U.S. 953, 962 (1986). When federal courts review decisions of state courts that affect FERC-filed rates, "the doctrine . . . is a matter of enforcing the Supremacy Clause." *Id.* at 963. The filed rate doctrine is rooted in a decision of the United States Supreme Court holding that the courts have no authority to alter the "just and reasonable" rate determined by the FERC's predecessor agency, the Federal Power Commission. *Montana-Dakota Co. v. Pub. Serv. Co.*, 341 U.S. 246, 251–52 (1951). Actors in the market for public utilities "can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the [FERC], and not even a court can authorize commerce in the commodity on other terms." *Id.* at 251.

In *Nantahala*, the Supreme Court refused to enforce an order of the North Carolina Utility Commission that would have prevented the local utility from recovering the full cost of acquiring power under a FERC-approved scheme. *Nantahala*, 476 U.S. at 972. "Once FERC sets [the wholesale] rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority." *Id.* at 966. The Supreme Court relied on the filed rate doctrine again when it held that "the Supremacy Clause compels the [state commission] to permit [the public utility] to recover as reasonable operating ex-

penses costs incurred as the result of paying a FERC-determined wholesale rate." *Mississippi Power v. Mississippi ex rel. Moore*, 487 U.S. 354, 373 (1988). The Court ordered the state commission to treat the public utility's FERC-mandated costs as reasonably incurred operating expenses for the purpose of setting the public utility's retail rates. *Id.* at 369–70.

The PUC's order in this case required the public utilities to absorb 40 percent of costs that the FERC had already approved as included in the wholesale rate schedule filed by Tennessee Gas. The utilities argue that such an order is in clear violation of the filed rate doctrine because the PUC must pass through all costs approved by the FERC in setting the wholesale rate for Tennessee Gas. The PUC contends that the FERC, through its orders deregulating the natural gas industry, has created an exception to the filed rate doctrine based on the equities of dividing take-or-pay costs fairly among all segments of the natural gas industry.

The PUC relies on language in the FERC orders to the effect that since no one segment is to "blame" for take-or-pay costs, all segments should share the costs. Order No. 500, 52 Fed. Reg. 30334, 30337 (1987). The FERC expanded upon its view of how take-or-pay liability should be shared in Orders 500-H and 500-I. *See generally* Order No. 500-H, 54 Fed. Reg. 52344 (1989); Order No. 500-I, 55 Fed. Reg. 6605 (1990). The FERC also addressed the issue of take-or-pay liability in Order 528:

> "[T]he Commission urges state commissions to use the full extent of their authority to equitably allocate between LDCs and retail customers take-or-pay costs that flow through an interstate pipeline's rates. As the Commission stated in Order No. 500-H, to ensure that all segments of the industry share in contributing towards the resolution of the take-or-pay problem, . . . state regulatory agencies may implement, as some have, an equitable sharing mechanism similar to that established by the Commission [whereby pipelines agree to absorb 25–50 percent of take-or-pay costs] which requires LDCs to absorb a portion of the costs if they desire to assess a fixed charge. In the Commission's view nothing precludes a state commission from requiring an LDC to absorb a share of the costs as the Commission is requiring of interstate pipelines here."

Order No. 528, 55 Fed. Reg. 47863, 47866 (1990).

Based upon the language quoted above, the PUC avers that the FERC waived the application of the filed rate doctrine, allowing

state commissions to approve a retail rate that alters the wholesale rate filed by Tennessee Gas and approved by the FERC. The PUC relies on *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984), as authority for the proposition that the FERC has the authority to waive application of the filed rate doctrine. In *Chevron*, the United States Supreme Court provided that when reviewing a federal agency's interpretation of a statute, the first question to be addressed is "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. If the statute is silent or ambiguous with respect to the specific question at issue, a court may not impose its own construction, but must determine only whether the agency's construction is a permissible one. *Id.* at 843.

▆▆ Rather than supporting the PUC's claim that the FERC has authority to waive application of the filed rate doctrine, *Chevron* is inapposite. Congress, in passing the NGA, intended to fully occupy the field of interstate transportation and sale of natural gas. *Interstate Gas Co. v. Power Comm'n*, 331 U.S. 682, 689–90 (1947). "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction . . . ." *Nantahala*, 476 U.S. at 966 (quotation omitted). Under this bright line test, once FERC sets the wholesale rate, States may not collaterally attack the reasonableness of the filed rate. *Id.* at 970. Just as the FERC-approved rates are binding upon States, FERC-approved rates are binding upon the FERC because Congress established a bright line beyond which the FERC cannot step. This court has recognized and adopted the bright line test by which state commissions cannot inquire into the wholesale rate established by the FERC. *Appeal of Sinclair Machine Prod's, Inc.*, 126 N.H. 822, 829–30, 498 A.2d 696, 701–02 (1985). In *Sinclair*, we held that the PUC was preempted from disallowing portions of wholesale costs approved by the FERC. *Id.* at 830, 498 A.2d at 702.

We note that the issue of whether the FERC has the authority to waive application of the filed rate doctrine has been addressed in other jurisdictions. The Supreme Court of Illinois, ruling on a case where the Illinois Commerce Commission (ICC) determined that it had no authority to allocate any percentage of take-or-pay costs to an LDC but was overruled by the Illinois Appellate Court, held that the "FERC cannot rewrite the statutory provisions of the Natural Gas Act and has no authority to deviate from the clear intent of Congress. When FERC promulgates regulations, it cannot dispense with

the supremacy clause and the intent of Congress by saying that it believes inconsistent State regulation is permissible." *General Motors v. Illinois Commerce Com'n.*, 143 Ill. 2d 407, 419, 574 N.E.2d 650, 657 (1991), *cert. denied*, — U.S. —, 112 S. Ct. 1936 (1992).

The federal appellate court most experienced in regulatory disputes has also held that the FERC has no authority to waive the filed rate doctrine. *Columbia Gas Transmission Corp. v. F.E.R.C.*, 895 F.2d 791 (D.C. Cir.), *cert. denied*, — U.S. —, 111 S. Ct. 279 (1990). In *Columbia Gas*, the issue was whether the FERC could waive the notice requirements for changing the filed rate because public interest and equity required a change in the billing system. 895 F.2d at 796–97. "The [NGA] bars a regulated seller of natural gas from collecting a rate other than the one filed with the [FERC] and prevents the [FERC] itself from imposing a rate increase for gas already sold." *Id.* at 794 (citing *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 578 (1981)). In reaching this conclusion, the court noted that it was "unaware . . . of any principle in equity or law that empowers an agency to ignore explicit legislative commands." *Id.* at 797.

 While we understand the FERC's concern that take-or-pay costs be shared in an equitable manner, we can find no basis in law for the FERC to suggest, in effect, that when setting retail rates, States ignore the rates set by the FERC. In addition, we can see no inequity in allocating 100% of the take-or-pay costs to the retail ratepayers because these ratepayers received 100% of the benefits of deregulation through rate decreases. In the same orders in which the FERC suggested that state commissions ensure equitable allocation of costs between the LDCs and ratepayers, the FERC noted that it was the ratepayers who reaped the benefits of deregulation. The FERC itself recognized that the average $11 surcharge to ratepayers is "significantly less than the benefits received" from deregulation since costs fell, on average, by $64. Order No. 500-H, 54 Fed. Reg. 52344, 52357 (1989).

 In light of the review of authority discussed above, we find the PUC's arguments unpersuasive and hold that it was in error when it ordered Northern and EnergyNorth to absorb 40 percent of the costs that the FERC determined to be "just and reasonable." The PUC must pass through all FERC-approved costs that the PUC admits were prudently incurred by Northern and EnergyNorth.

*Vacated and remanded.*

All concurred.