Public Utilities Commission
No. 95-610

# Appeal of Public Service Company of New Hampshire

## (New Hampshire Public Utilities Commission)

May 13, 1996

*Sulloway & Hollis,* of Concord (*Martin L. Gross* and *Edward C. Moska* on the brief, and *Mr. Gross* orally), and *Linda T. Landis,* of Concord, on the brief, for Public Service Company of New Hampshire.

*James T. Rodier,* of Bedford, on the brief, and *Dickstein, Shapiro & Morin, L.L.P.,* of Washington, D.C. (*Frederick M. Lowther & a.* on the brief, and *Mr. Lowther* orally), for Freedom Energy Company, LLC.

*Douglas & Douglas,* of Concord (*Charles G. Douglas, III* on the brief and orally), for Cabletron Systems, Inc. and EnerDev, Inc.

*Backus, Meyer, Solomon & Rood,* of Manchester (*Robert A. Backus* on the brief), and *Joshua L. Gordon,* of Concord, by brief, for Campaign for Ratepayers Rights.

*LeBoeuf, Lamb, Greene & MacRae, L.L.P.,* of Boston, Massachusetts (*Paul K. Connolly, Jr. & a.* on the brief, and *Scott J. Mueller* orally), for Concord Electric Company, Exeter & Hampton Electric Company, and UNITIL Power Corp.

*Ransmeier & Spellman, P.C.,* of Concord (*Dom S. D'Ambruoso* and *John T. Alexander* on the brief, and *Mr. D'Ambruoso* orally), for Connecticut Valley Electric Company, Inc.

*Dean, Rice & Howard, P.A.,* of Manchester (*Mark W. Dean* and *Timothy S. Reiniger* on the brief), for New Hampshire Electric Cooperative, Inc.

*Michael W. Holmes,* consumer advocate, by brief and orally, for the Office of the Consumer Advocate.

*Sanders and McDermott,* of Hampton (*Michael B. King* on the brief), for Senator C. Jeanne Shaheen & a., as *amici curiae.*

*Jeffrey R. Howard,* attorney general (*Wynn E. Arnold,* assistant attorney general, on the brief and orally), for the State, as *amicus curiae.*

The Business and Industry Association of New Hampshire filed no brief.

The Conservation Law Foundation of New England, Inc., filed no brief.

*Steven E. Thomas,* of Westborough, Massachusetts, for Granite State Electric Company, filed no brief.

The Public Utility Policy Institute filed no brief.

THAYER, J. Public Service Company of New Hampshire (PSNH) appeals an order of the New Hampshire Public Utilities Commission (PUC or commission) declaring that PSNH's electric utility franchise is not exclusive as a matter of law. PSNH argues that the PUC erred by failing to adhere to a longstanding pattern of statutes and court decisions favoring exclusivity, by ignoring its own administrative gloss on its statutory authority, and by exceeding the limited scope of its authority to permit competition under Laws 1995, chapter 272. We affirm.

*I. Facts and Procedural History*

This case was initiated on August 1, 1994, when Freedom Energy Company, LLC (Freedom), through a predecessor company, filed with the PUC a petition for permission and approval to do business on a limited basis as a public utility in New Hampshire (petition). Freedom proposed to "purchase wholesale electric power under the jurisdiction of the Federal Energy Regulatory Commission (FERC) for delivery to the PSNH transmission system and to resell it at retail to certain end-users that are located in proximity to PSNH's transmission system." Freedom averred that it could obtain, if necessary, an order from the FERC compelling transmission of the purchased power by PSNH.

The commission docketed the petition and granted requests for full intervention to PSNH; Concord Electric Company, Exeter & Hampton Electric Company, and UNITIL Power Corporation; Connecticut Valley Electric Company; Granite State Electric Company (Granite State); New Hampshire Electric Cooperative, Inc.; Cabletron Systems, Inc. and EnerDev, Inc.; the Business and Industry Association of New Hampshire; Campaign for Ratepayers Rights; the Conservation Law Foundation; and the Public Utility Policy Institute. In addition, the Office of the Consumer Advocate intervened pursuant to RSA 363:28, II (1995).

Following a hearing, the PUC ruled that Freedom's proposed activities would render it a public utility subject to regulation by the PUC, that PSNH's franchise rights within its service territory are not exclusive as a matter of law, and that the PUC has the authority and duty under RSA 374:26 (1995) to grant a competing retail

franchise within PSNH's service territory if the public good would thereby be served. The PUC denied motions for rehearing by PSNH and Granite State, and this appeal followed.

## II. Scope of the Appeal and Standard of Review

■ This appeal does not require us to reach the question of whether restructuring the electric utility industry is in the public interest. The PUC has yet to rule on whether Freedom's petition — or, more generally, retail competition in the industry — would serve the public good. More importantly for purposes of our review, PSNH has restricted its appeal to the narrow legal question of whether upon a public good determination the PUC has the statutory authority to permit retail competition within PSNH's service territories. The scope of our review is correspondingly narrow. *See* SUP. CT. R. 16(3)(b); *Blair v. Manchester Water Works*, 103 N.H. 505, 506, 175 A.2d 525, 526 (1961).

Several parties have urged us to hold, in the interests of judicial economy, that PSNH has waived its rights to raise certain claims in future proceedings by failing to include them in this appeal. Assuming, without deciding, that these parties could have moved for leave of this court to add this question for decision on appeal, they have not done so. Accordingly, we do not consider this argument. *See Appeal of Toczko*, 136 N.H. 480, 487, 618 A.2d 800, 804–05 (1992).

RSA 541:13 (1974) sets out the standard of review governing this appeal. A party seeking to set aside or vacate an order of the PUC has the burden of demonstrating that the order is contrary to law or, by a clear preponderance of the evidence, that the order is unjust or unreasonable. In addition, findings of fact by the PUC are presumed lawful and reasonable. RSA 541:13; *see Appeal of Richards*, 134 N.H. 148, 158, 590 A.2d 586, 592, *cert. denied*, 502 U.S. 899 (1991).

## III. Analysis

### A. RSA 374:26

The question presented by this appeal is essentially one of statutory construction. RSA 374:22, I (1995) requires that any entity seeking to operate as a public utility in New Hampshire must first obtain permission and approval from the commission. RSA 374:26 sets out the standard to be applied by the PUC in granting or withholding such permission:

> *Permission.* The commission *shall* grant such permission whenever it shall, after due hearing, find that such engaging in business, construction or exercise of right, privilege or franchise would be *for the public good, and not other-*

*wise*; and may prescribe such terms and conditions for the exercise of the privilege granted under such permission as it shall consider for the public interest. Such permission may be granted without hearing when all parties are in agreement.

(Emphasis added.)

PSNH argues that this statute is ambiguous because it neither provides nor withholds from the commission authority to grant competing electric utility franchises. According to PSNH, "a pattern of statutes and court decisions developed over a period of more than eighty years" requires that this ambiguity be resolved in favor of exclusivity. Freedom, in contrast, reads the statute as unambiguously authorizing and requiring the PUC to grant a competing franchise when such grant would be for the public good. We hold that under the plain language of RSA 374:26 the PUC is both authorized and obligated to grant a competing electric utility franchise when it determines that such grant would serve the public good.

In construing the meaning of RSA 374:26, "we first examine the language found in the statute, and where possible, we ascribe the plain and ordinary meanings to words used." *Appeal of Astro Spectacular*, 138 N.H. 298, 300, 639 A.2d 249, 250 (1994) (citation and quotation omitted). The plain language of RSA 374:26 requires the PUC to grant a public utility franchise when that would be "for the public good, and not otherwise." We find nothing in the statute to support PSNH's contention that the PUC may never grant a competing electric utility franchise, regardless of the public good. Such a reading would contradict "the intent of the legislature as expressed in the words of [the] statute," *Nashua Y.W.C.A. v. State*, 134 N.H. 681, 682, 597 A.2d 535, 536 (1991) (quotation omitted), by depriving the PUC of authority to grant franchises for the public good.

In effect, PSNH asks us to interpolate words of limitation into RSA 374:26 prohibiting the PUC from granting additional franchises within the service territory of a franchised electric utility. This we decline to do. The legislature is presumed to choose the words of a statute advisedly. *Caswell v. BCI Geonetics, Inc.*, 121 N.H. 1048, 1050, 437 A.2d 321, 322 (1981). "Courts can neither ignore the plain language of the legislation nor add words which the lawmakers did not see fit to include. The legislative intent is to be found not in what the legislature might have said, but rather in the meaning of what it did say." *Appeal of Astro Spectacular*, 138 N.H. at 300, 639 A.2d at 250 (quotations, citation, and brackets omitted).

## B. Prior Decisions of This Court

■ Nothing in our prior decisions compels a contrary result. Our most extensive treatment of the question of franchise exclusivity prior to today is found in *Opinion of the Justices*, 84 N.H. 559, 566–68, 149 A. 321, 325–26 (1930). In opining that an *ad valorem* tax on the franchises of electric and gas utilities would be constitutional, this court observed:

> While it is true that the grant is not exclusive in the sense that the state cannot give a like grant to a competitor, it is also true that the whole policy of modern public utility legislation and control is against any such second grant. In theory, competition may have to be met. As a practical proposition, known to and acted upon by everybody, no competition will be permitted.

*Id.* at 567, 149 A. at 325. This passage illustrates a distinction running throughout the opinion's entire discussion of franchise exclusivity; namely, that *in theory* competing franchises could be granted but *in practice* they would not. The manifest purpose of this distinction was to separate what was legally permitted from what was practically required at that time.

We do not believe that this discussion of electric and gas utilities as monopolies of practical necessity in 1930 was intended to bind future generations to a policy based on the perceived technological and economic limitations of that day. Rather, we described the monopoly status of these utilities as derived from "sound economic reasons," *id.* at 567, 149 A. at 326, a justification of policy and not of law. What was sound regulatory policy in 1930 may be anachronistic today. In recognizing "the theoretical right to obtain a competing grant," *id.* at 568, 149 A. at 326, this court made clear the commission's authority to grant a competing franchise should the public good so require.

Our cases interpreting the role of the PUC in conjunction with New Hampshire's constitutional directive favoring free enterprise also shed light on the legal status of electric utility monopolies. Part II, article 83 of the New Hampshire Constitution sets out the State's policy on free enterprise and provides in part: "Free and fair competition in the trades and industries is an inherent and essential right of the people and should be protected against all monopolies and conspiracies which tend to hinder or destroy it."

In *New England Household Moving & Storage, Inc. v. Public Utilities Commission*, 117 N.H. 1038, 381 A.2d 745 (1977), a household moving company appealed the PUC's denial of a certifi-

cate to operate as a motor vehicle carrier under RSA chapter 375-A based on the applicant's failure to prove the inadequacy of existing services. The provision governing the issuance of certificates stated that the proposed service must be required by the "public convenience and necessity." *Id.* at 1039, 381 A.2d at 746; *see* RSA 375-A:3 (1995). We vacated the PUC's denial of the certificate and remanded, stating that "[o]ther factors, *including the desirability of additional competition*, may warrant a finding that the additional service is required by the public convenience and necessity, although existing carriers can adequately fulfill present and future needs." *New England Household,* 117 N.H. at 1041, 381 A.2d at 747 (emphasis added). In so holding, we observed that "free enterprise and the market economy are constitutional rights in this state," that "[t]he legislature is authorized to effectuate this policy," and that regulatory boards may be "raising barriers to entrance into business and may be out of step with legislative intent by being protectionist of their trade and limiting competition." *Id.* at 1041, 381 A.2d at 748 (quotation and brackets omitted); *see also O'Neil v. Public Util. Comm'n,* 119 N.H. 930, 935, 410 A.2d 244, 248 (1979).

In *Appeal of Omni Communications, Inc.,* 122 N.H. 860, 451 A.2d 1289 (1982), we held that the PUC lacked the authority to regulate the use of radio pagers. After reviewing the history of the 1902 Constitutional Convention, which produced the amendment favoring free enterprise found in part II, article 83 of the State Constitution, we concluded that the fundamental preference of this State is for free enterprise. *Id.* at 862, 451 A.2d at 1290. Against this constitutional backdrop, "[t]he role and duty of [the PUC] is to oversee and regulate those few necessary monopolies so that the constitutional rights of free trade and private enterprise are disrupted as little as possible." *Id.* at 862–63, 451 A.2d at 1291. We concluded that in enacting RSA 362:2, which defines the term "public utility," the legislature did not intend to subject radio-paging services to PUC regulation.

■ Although not dealing directly with electric utilities, both *New England Household* and *Omni* stand for the proposition that legislative grants of authority to the PUC should be interpreted in a manner consistent with the State's constitutional directive favoring free enterprise. Limitations on the right of the people to "[f]ree and fair competition," N.H. CONST. pt. II, art. 83, must be construed narrowly, with all doubt resolved against the establishment or perpetuation of monopolies. RSA 374:26 thus should not be interpreted as creating monopolies capable of outliving their usefulness.

## C. Prior Commission Orders

The orders of the PUC have likewise recognized that the monopoly status enjoyed by certain public utilities is conditioned on continued subservience to the public good. In a case decided only two years after its establishment, the commission explained that

> the monopoly granted to companies in fields now occupied by them was not made absolute. *The commission was directed to admit new utilities whenever the public good would be thereby promoted.* The law was designed for the benefit of the public and not of the utilities, although it inevitably operates to the advantage of both. *The utility has no vested right to its monopoly. It must meet competition whenever, for any reason, the public good will be thereby promoted.*

*Parker et als. v. Hudson Water Co. et al.*, 3 N.H.P.S.C. 142, 151 (1913) (emphasis added). A more succinct encapsulation of our holding today is difficult to imagine.

This theme — that regulated monopoly is rooted in the public good and not mandated by law — again finds expression in a 1929 order in which the commission declared its unwillingness to "extend territorial monopoly to wholesaling utilities." *Grafton Power Company*, 12 N.H.P.S.C. 379, 387 (1929). The commission observed:

> Monopoly has always been considered odious at common law, inimical to the public welfare and against public policy. . . . [D]esignation of territory and the fact that only one utility is authorized by the commission to operate in a limited area has resulted in the general understanding by both utilities and public that the commission grants monopolistic privileges. Theoretically, however, monopolistic rights are not given as all grants are conditioned upon the utility's functioning adequately and with reasonable charges. No utility has a monopoly as of common right.

*Id.* at 385–86 (citation omitted). The commission then stated that "[t]he privileges of monopoly will be granted when sound economic reasons dictate that such procedure is for the public good." *Id.* at 387. This derivation of monopoly can only mean that if the economic underpinnings of monopoly were to change, the commission could reassess what the public good required.

In 1990, the commission issued its most forceful statement since *Parker* concerning its authority to grant franchises.

[O]ur franchising authority enables us to authorize competition among regulated utilities. . . . In accordance with the plain meaning of the terms of [RSA 374:26], the commission must grant franchises to companies applying to compete with currently franchised utilities when such a result would be in the public good. Indeed, . . . to hold otherwise would produce the anomalous result that the commission could find that competition is in the public good, but could not franchise carriers who desire to compete.

*Re AT&T Communications of New Hampshire*, 75 N.H.P.U.C. 670, 673 (1990). Although *AT&T* dealt with a petition by a telecommunications company to offer specialized long-distance services, the commission based its authority to permit competition on a general reading of the same statute at issue in this case.

Only one commission order cited by PSNH offers support for its position. In *Re Northern Utilities, Inc.*, 67 N.H.P.U.C. 645 (1982), the PUC stated:

The conferral of utility status on a business operation has certain *statutory* ramifications that cannot be ignored. One of the advantages bestowed upon a business operation becoming a utility is the right to be the sole provider of utility service within a specified area. Concomitant with this advantage is the obligation to provide service to any and all customers within the service territory.

*Id.* at 647 (emphasis added). Standing alone, this dictum, for which no authority is cited and which applies to the subsequently restructured natural gas industry, *see Generic Investigation Into Natural Gas Transportation Service and Rates*, 78 N.H.P.U.C. 479 (1993); *Appeal of Northern Utilities*, 136 N.H. 449, 451, 617 A.2d 1184, 1184–85 (1992), is insufficient to sustain PSNH's assertion that the PUC has long recognized electric utility franchises as exclusive as a matter of law.

PSNH also points to orders of the PUC explicitly granting it "exclusive service territories." *See Re Public Service Company of New Hampshire*, 66 N.H.P.U.C. 103, 105 (1981); *Re Public Service Company of New Hampshire*, 65 N.H.P.U.C. 601, 603 (1980); *Re Public Service Company of New Hampshire*, 64 N.H.P.U.C. 147, 149 (1979); *Re Public Service Company of New Hampshire*, 63 N.H.P.U.C. 359, 361 (1978). These orders are subject to the PUC's statutory authority to "alter, amend, suspend, annul, set aside or otherwise modify any order made by it." RSA 365:28 (1995); *see Appeal of Office of Consumer Advocate*, 134 N.H. 651, 657–58, 597 A.2d 528, 532 (1991).

■ The foregoing discussion makes clear that PSNH's contention that the PUC has placed a binding administrative gloss on its statutory authority requiring the exclusivity of electric utility franchises must fail. The administrative gloss doctrine, which finds its origins in zoning cases, applies when the provision in question is ambiguous, the agency responsible for its administration has interpreted it over a period of years in a consistent manner, and the legislature has not interfered with this interpretation. *See Hansel v. City of Keene*, 138 N.H. 99, 104, 634 A.2d 1351, 1354 (1993). Even if we assume that the doctrine applies to the PUC, our holding that RSA 374:26 is unambiguous and the commission's declarations in 1913 and 1990 that competing franchises may be granted renders it inapplicable to this case.

PSNH's administrative gloss argument boils down to the contention that the PUC's longstanding practice — based on its delegated authority to determine the public good — of granting exclusive service territories to electric utilities cannot be reversed in the absence of new legislation on the subject, even if the underlying economic and technological considerations prompting the traditional practice have changed. We reject this contention. "The PUC was established to provide comprehensive provisions for the establishment and control of public utilities in the State." *Appeal of Granite State Elec. Co.*, 120 N.H. 536, 539, 421 A.2d 121, 123 (1980). It has broad discretionary authority to determine the public good under RSA 374:26. That the commission may have historically interpreted the public good as requiring monopolies in the provision of retail electric service does not preclude it from adopting a new paradigm based on changing concepts of what the public good requires. "[A]n administrative agency is not disqualified from changing its mind . . . ." *Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 417 (1993) (quotation omitted).

## D. Related Statutes

Finally, PSNH points to a medley of statutes governing public utilities which it argues evinces a legislative understanding that electric utility franchises are exclusive. We note that the legislature has had ample opportunity to modify RSA 374:26 if it disagreed with the commission's interpretation of its franchising authority in *Parker* and *AT&T*. That it has not done so is evidence that "the administrative construction conforms to the legislative intent." *Hamby v. Adams*, 117 N.H. 606, 609, 376 A.2d 519, 521 (1977).

PSNH first identifies RSA 374:28 (1995) as indicating the legislature's intent that electric utility franchises be exclusive. This statute grants the commission the authority to revoke a franchise

upon a finding that a utility has failed to provide service or has provided inadequate service. PSNH argues that this provision would have been unnecessary if the commission had the authority to grant competing franchises. This argument is without merit. Even in a competitive environment, RSA 374:28 has the salutary effect of enabling the PUC to halt the operations of utilities providing inadequate service. Moreover, the fact that competitive franchises are permitted under RSA 374:22-g (Supp. 1995) (providing for competition in certain local exchange telephone service territories) undermines any suggestion that the existence of competing utility franchises is incompatible with a statutory method for revoking franchises.

We likewise do not believe that RSA chapter 83-C (1991 & Supp. 1995), providing for a franchise tax on electric utilities, mandates that electric utility franchises granted under RSA 374:26 be exclusive. Although we offer no opinion on whether or to what extent a franchise tax on electric utilities would be appropriate in the event competition is introduced, *see* N.H. CONST. pt. II, art. 6; *Opinion of the Justices*, 101 N.H. 549, 137 A.2d 726 (1958); *Public Service Co. v. State*, 101 N.H. 154, 136 A.2d 600 (1957); *Opinion of the Justices*, 84 N.H. at 566–71, 149 A. at 325–27; *Opinion of the Justices*, 82 N.H. 561, 564–66, 138 A. 284, 286–87 (1927), the franchise tax imposed by RSA chapter 83-C does not by its terms pose a legal barrier to competition.

PSNH relies heavily on a set of repealed statutory provisions that it argues reveal a legislative preference for exclusive electric utility franchises. *See* RSA 374:22-a, :22-b, :22-c, :22-d (1984) (repealed 1989). We see no point in speculating on the reasons these provisions were enacted or subsequently repealed. The effect of repealing these provisions is that any limitation imposed by them on the PUC's franchising authority under RSA 374:26 has been lifted.

PSNH also looks for support in the Limited Electrical Energy Producers Act (LEEPA), RSA ch. 362-A (1995). PSNH argues that LEEPA contemplates exclusive territories for franchised utilities by enabling qualifying producers to sell their entire output to "*the* electric public utility which serves the franchise area in which the installations of such producers are located," RSA 362-A:3 (emphasis added), and by authorizing a qualifying producer to sell power to "not more than 3 purchasers other than *the* franchise electric utility," RSA 362-A:2-a, I (emphasis added). We are unwilling to impute to the legislature in enacting LEEPA an intent to limit by implication the commission's franchising authority under RSA 374:26. LEEPA was enacted in an era when the public benefits of

exclusive retail service territories for electric utilities were virtually unquestioned. That the legislature may have drafted LEEPA with an eye toward existing conditions does not mean that those conditions were intended to be frozen in place. RSA 374:26's clear delegation to the PUC of the authority to grant franchises in the public good will not be defeated by an unarticulated and conjectural premise said to underlie a largely unrelated statute.

PSNH discerns a similar premise in the Least Cost Energy Planning provisions found in RSA 378:37-:42 (1995). PSNH's only argument as to why these provisions demonstrate a legislative preference for exclusivity is that forecasts of electrical demand, *see* RSA 378:38, I, would be both impossible and pointless in a competitive environment. We are not persuaded. Even assuming the legislature had the regulated monopoly model in mind when it enacted this statute, for the reasons stated in conjunction with LEEPA, we would be unprepared to limit the clear grant of authority contained in RSA 374:26 by an unspoken assumption in a statute wholly unrelated to franchising.

PSNH next argues that by specifically authorizing limited retail competition among electricity providers in certain statutes, the legislature has demonstrated its belief that specific legislation is required to authorize such competition. In support of this contention, PSNH first directs our attention to the provision in LEEPA authorizing qualifying producers to sell power to up to three customers other than the franchised utility. *See* RSA 362-A:2-a, I. We find this provision inapposite. Whether or not electric utility franchises are exclusive, specific legislation would be necessary to permit a *non-franchised* power producer to sell directly to customers. *See* RSA 362:2; RSA 374:22, I.

As further support PSNH refers us to a recently enacted statute authorizing the PUC to grant competing franchises in "telephone franchise areas served by a telephone utility that provides local exchange service and that has more than 25,000 access lines." RSA 374:22-g, I. PSNH suggests that enactment of this provision would have been unnecessary if the PUC already had the authority to grant competing franchises under RSA 374:26. This argument overlooks RSA 374:22-f (Supp. 1995), which, broadly speaking, proclaims that "the service territory of [a] telephone utility that provides local exchange service and that has fewer than 25,000 access lines" shall be exclusive. One may just as well argue that enactment of this provision would have been unnecessary if, as PSNH implies, such service territories were already exclusive under RSA 374:26. RSA 374:22-f and RSA 374:22-g were enacted at

the same time, and in combination they simply demonstrate the legislature's plenary power to spell out, when it sees fit, the conditions under which competition will and will not be permitted in utility service territories.

In a similar vein, PSNH argues that the PUC has exceeded the limited authority accorded it by the legislature under chapter 272 of Laws 1995. In the findings section, the general court declared that retail wheeling, a system whereby a remote supplier can utilize a local distribution system, *see* Laws 1995, 272:3, "may provide a basis for determination of electricity price levels that relies to a greater extent upon competition than upon regulation" and that

> [w]hile retail wheeling appears to be a highly desirable electricity market paradigm, there are significant uncertainties, some unique to New Hampshire, that must be taken into account when determining a state policy for retail wheeling. Therefore, it is the purpose of this act to provide sufficient information to legislators so that they may make recommendations to the general court regarding legislation for the 1996 session.

Laws 1995, 272:1.

In furtherance of this purpose, section 272:2 establishes the Retail Wheeling and Restructuring Committee, which is charged with reviewing numerous issues associated with the prospect of bringing retail wheeling to New Hampshire. In addition, section 272:12 amends RSA chapter 374 by inserting after RSA 374:26:

> 374:26-a *Retail Competition Pilot Program.* The commission shall establish a pilot program, under such terms and conditions as the commission shall deem appropriate, for the purpose of determining the implications of retail competition in the electric industry, provided that the commission determines that such program is fair, lawful, constitutional, consistent with RSA 378:37, and in the public good. This pilot program shall be open to all franchise areas and to all classes of customers.

PSNH argues that the provisions of chapter 272 indicate the legislature's intent to reserve for itself policy issues associated with electric utility restructuring and to limit the PUC's role to the gathering of information that will aid the legislature in its policymaking role.

We presume that the legislature was aware of RSA 374:26 when it enacted Laws 1995, chapter 272. *See Barksdale v. Town of*

*Epsom*, 136 N.H. 511, 516, 618 A.2d 814, 817 (1992). PSNH can identify no words in chapter 272 that expressly limit the PUC's franchising authority under RSA 374:26, and we therefore conclude that the legislature intended no such limitation. Before enactment of chapter 272, the legislature had no assurance that the PUC would investigate retail wheeling issues in the manner prescribed by section 272:12. Legislation such as section 272:12 was therefore necessary for the legislature to acquire the information it sought, even though some of the information may independently have become available through the PUC's activity on dockets such as Freedom's.

In sum, PSNH's attempt to find an implicit limitation in other statutes on the PUC's unambiguous franchising authority under RSA 374:26 must fail.

*IV. Conclusion*

In conclusion, we hold that electric utility franchises in New Hampshire are not exclusive as a matter of law. We emphasize that our decision today should not be read as expressing a point of view either on the desirability of retail competition among electric utilities as a matter of policy or on the recoverability of "stranded costs" in the event competition is introduced. We have been presented with a narrow question of law — whether upon a public good determination the PUC has the statutory authority under RSA 374:26 to grant a competing electric utility franchise within the service territory of an incumbent utility — and we have answered in the affirmative. The question of whether and under what terms Freedom's proposed operations would in fact serve the public good is left to the PUC in the first instance.

*Affirmed.*

JOHNSON, HORTON, and BRODERICK, JJ., did not sit; BATCHELDER, J., retired, sat by special assignment under RSA 490:3; all who sat concurred.