Public Utilities Commission
Nos. 96-268
      96-269

### APPEAL OF CAMPAIGN FOR RATEPAYERS RIGHTS & a.

March 5, 1998

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief) and *Backus, Meyer, Solomon, Rood & Branch*, of Manchester (*Robert A. Backus* orally), for Campaign for Ratepayers Rights.

*Michael W. Holmes*, consumer advocate (*Mr. Holmes* and *James R. Anderson*, assistant consumer advocate, on the brief, and *Mr. Holmes* orally), for the Office of the Consumer Advocate.

*Gerald M. Eaton* and *Linda T. Landis*, of Manchester (*Mr. Eaton* and *Ms. Landis* on the brief, and *Mr. Eaton* orally), for Public Service Company of New Hampshire.

*Philip T. McLaughlin*, attorney general (*Wynn E. Arnold*, assistant attorney general, on the brief and orally), for the State, as *amicus curiae*.

HORTON, J. The petitioners, Campaign for Ratepayers Rights (CRR) and Office of the Consumer Advocate (OCA), appeal a ruling of the public utilities commission (PUC) approving several special contracts entered into by Public Service Company of New Hampshire (PSNH) and several industrial customers for electrical power. We affirm.

In 1989, PSNH filed for bankruptcy in the United States Bankruptcy Court for the District of New Hampshire. As part of the reorganization plan, PSNH entered into a "rate agreement" with the State which fixed rates for several years. Implementation of the agreement required legislation, and the legislature responded by enacting RSA chapter 362-C (1995). The rate agreement suspended the traditional ratemaking process, *see* RSA 378:28 (1995), and created a seven-year period of annual rate increases. Under RSA 362-C:8 (1995), PSNH could not engage in ratemaking in any manner other than that specified by the agreement. A majority of this court approved of the rate agreement established under the bankruptcy reorganization plan. *See Appeal of Richards*, 134 N.H. 148, 165, 590 A.2d 586, 596-97, *cert. denied*, 502 U.S. 899 (1991).

Between July 28 and October 26, 1995, PSNH entered into special contracts with Teradyne, Inc.; Kollsman, Division of Sequa Corporation; Miniature Precision Bearings Corporation; Textron Automotive Interiors, Inc.; and Wyman-Gordon Investment Castings, Inc., and filed them with the PUC. Customers with special contracts pay a contractually agreed price for their electricity which varies from the price paid under the rate of general application. The PUC approved the contracts between January 18 and January 29, 1996. At the time of argument, the PUC had approved over sixty special contracts.

On appeal, the petitioners allege that the PUC violated: (1) RSA 362-C:6 (1995), which prohibits fixing rates in violation of the rate agreement, by approving the special contracts challenged here; (2) RSA 378:11-a (Supp. 1995) (amended 1996) by creating economic development or retention rates for individual companies; and (3) RSA chapter 541-A (1997), the New Hampshire Administrative Procedures Act, by requiring special contract applications to comply with a "checklist" that was created by administrative order rather than statutory rulemaking procedures.

"A party seeking to set aside or vacate an order of the PUC has the burden of demonstrating that the order is contrary to law or, by a clear preponderance of the evidence, that the order is unjust or unreasonable. In addition, findings of fact by the PUC are presumed lawful and reasonable." *Appeal of Public Serv. Co. of N.H.*, 141 N.H.

13, 16, 676 A.2d 101, 103 (1996); *see* RSA 541:13 (1997). In reviewing the PUC's rules, this court "is not free to substitute its judgment on the wisdom of the rules for that of the commission." *Appeal of Concord Natural Gas Corp.*, 121 N.H. 685, 692, 433 A.2d 1291, 1296 (1981).

CRR and OCA argue that RSA 362-C:6 prohibits the PUC from approving special contracts with PSNH customers. This statute provides:

> Finality of Approval. If the Commission takes final action under RSA 362-C:3 or RSA 362-C:5 to approve the agreement and to fix the rates for Public Service Company of New Hampshire or its successor in the manner prescribed in the agreement, or to approve and implement an alternative reorganization plan, or both, the commission shall not thereafter issue any order or process which would alter, amend, suspend, annul, set aside or otherwise modify such approval or result in the fixing of rates other than in the manner prescribed in the agreement or the approved alternative reorganization plan.

RSA 362-C:6. The PUC argues that RSA 378:18 (1995) (amended 1996) supports its approval of the special contracts. RSA 378:18 provides:

> Special Contracts for Service. Nothing herein shall prevent a public utility from making a contract for service at rates other than those fixed by its schedules of general application, if special circumstances exist which render such departure from the general schedules just and consistent with the public interest, and the commission shall by order allow such contract to take effect.

CRR argues that RSA 362-C:6 prohibits the issuance of special contracts because it is a more recent and more specific statute than RSA 378:18.

"If any reasonable construction of the two statutes taken together can be found, this court will not find that there has been an implied repeal." *Board of Selectmen v. Planning Bd.*, 118 N.H. 150, 153, 383 A.2d 1122, 1124 (1978). "When interpreting two statutes which deal with similar subject matter, we will construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statute." *Petition of Public Serv. Co. of N.H.*, 130 N.H. 265, 282, 539 A.2d 263, 273 (1988) (citation omitted).

RSA 378:18 authorizes the approval of special contracts, which does not constitute a "fixing of rates" as envisioned by RSA 362-C:6. In the present case, the petitioners allege that approval of the special contracts will result in lost revenue during the rate agreement period, and anticipate that PSNH may later attempt to recoup this lost revenue by imposing higher rates on ratepayers after the rate agreement expires.

However, neither petitioner offered any evidence showing that PSNH caused "the allocation of base rate revenue responsibility among residential, commercial, industrial and municipal customers . . . to change without legislative approval . . . ." RSA 362-C:8. Although PSNH charged its customers with special contracts an amount different than the rate of general application, PSNH did not adjust the revenue requirements or the tariff rate for general ratepayers to recoup possible lost revenues from the issuance of special contracts. The rate for all general ratepaying customers remained unchanged, in compliance with RSA 362-C:6, which prohibits changes to the revenue requirements or tariff rate for all general customers. Thus, PSNH did not violate the rate agreement by issuing special contracts, and CRR and OCA suffered no harm.

We will not address the merits of CRR and OCA's other arguments because the absence of direct and immediate harm denies both parties standing. In *Appeal of Richards*, we held that CRR had standing to challenge the rate agreement established under RSA chapter 362-C. *Appeal of Richards*, 134 N.H. at 157, 590 A.2d at 591. In that case, CRR represented ratepayers whose increased electrical rates as a result of the rate agreement constituted a direct economic injury. *Id.* at 156-57, 590 A.2d at 591. Similarly, in *New Hampshire Bankers Ass'n v. Nelson*, we concluded that the New Hampshire Bankers Association (NHBA) had standing to challenge the banking commissioner's determination that savings banks could issue N.O.W. accounts because NHBA's members, who were also directly regulated by the commissioner, would suffer direct injury because the determination increased their competitors' product lines. *New Hampshire Bankers Ass'n v. Nelson*, 113 N.H. 127, 128, 302 A.2d 810, 811-12 (1973).

Any injury suffered by ratepayers represented by CRR is neither immediate nor direct because any potential injury would arise only through increased rates imposed during a subsequent ratesetting proceeding. Likewise, while the legislature has granted OCA statutory standing, we find that "the interests of residential utility customers" are not presently "involved." *See* RSA 363:28 (1995).

The legislature recently addressed the same issue of future harm to ratepayers that might result from shifting the burden of lost revenue from special contracts issued during the fixed rate period to ratepayers after the fixed rate period. It enacted legislation that prevents the utility companies from "recover[ing] from other ratepayers the difference between the regular tariffed rate and the special contract rate" for special contracts entered into before June 3, 1996. RSA 378:18-a, I (Supp. 1997). To the extent that PSNH would propose such a revenue recovery from the special contracts here involved, or other special contracts, the PUC must give careful consideration to the nature of special contracts and their relation to rates of general applicability.

*Affirmed.*

BRODERICK, J., did not sit; the others concurred.