Public Utilities Commission
No. 2008-897

APPEAL OF STONYFIELD FARM, INC. & a.
(New Hampshire Public Utilities Commission)

Argued: June 16, 2009
Opinion Issued: August 5, 2009

*Sheehan Phinney Bass & Green, P.A.*, of Manchester (*Edward A. Haffer* on the brief and orally), for the petitioners.

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Wilbur A. Glahn, III & a.* on the brief, and *Mr. Glahn* orally), and *Robert A. Bersak* and *Linda T. Landis*, of Manchester, on the brief, for the respondent.

*Kelly A. Ayotte*, attorney general (*K. Allen Brooks*, senior assistant attorney general, on the brief and orally), for the State.

*Meredith A. Hatfield*, consumer advocate, on the brief, for the Office of Consumer Advocate, as *amicus curiae*.

*Backus, Myer and Solomon*, of Manchester (*Robert A. Backus* on the joint brief), for Campaign of Ratepayers' Rights, as *amicus curiae*.

*Arthur B. Cunningham*, of Hopkinton, on the joint brief, for Clean Water Action, New Hampshire Sierra Club and Union of Concerned Scientists, as *amici curiae*.

*Melissa A. Hoffer* and *Kristine E. Kraushaar*, of Concord, on the joint brief, for Conservation Law Foundation, as *amicus curiae*.

*Wadleigh, Starr & Peters, PLLC*, of Manchester (*Ronald J. Lajoie* on the joint brief), for Resident's Environmental Action Committee for Health, as *amicus curiae*.

*Orr & Reno, PA*, of Concord (*Douglas L. Patch* on the brief), for TransCanada Hydro Northeast, Inc., as *amicus curiae*.

DALIANIS, J. The petitioners, Stonyfield Farm, Inc., H & L Instruments, LLC, and Great American Dining, Inc., appeal a decision of the New Hampshire Public Utilities Commission (PUC) ruling that it lacks authority to determine whether installing certain technology at the Merrimack Station belonging to the respondent, Public Service Company of New Hampshire (PSNH), is in the public interest. *See* RSA 369-B:3-a (Supp. 2008). We dismiss the appeal.

## I. Background

PSNH, the state's largest public utility, has historically provided electric generation, transmission and distribution services to a majority of New Hampshire residents. *Appeal of Pinetree Power*, 152 N.H. 92, 93 (2005). The instant matter concerns installing a wet flue gas desulphurization system, commonly known as "scrubber technology," at Merrimack Station in Bow to reduce the facility's mercury emissions. Merrimack Station, which burns coal to produce electricity, is one of PSNH's fossil fuel generation assets. *See* RSA 369-B:3-a.

In June 2006, the legislature enacted the Mercury Emissions Program, *see* RSA 125-O:11-:18 (Supp. 2008), to reduce "mercury emissions at the coal-burning electric power plants in the state as soon as possible." RSA 125-O:11, I. The program is intended to "prevent, at a minimum, 80 percent of the aggregated mercury content of the coal burned at these plants from being emitted into the air by no later than the year 2013." *Id.*

To accomplish this objective, the legislation specifically requires PSNH to install "the best known commercially available technology . . . at Merrimack Station," which the New Hampshire Department of Environ-

mental Services (DES) has determined is the scrubber technology. *Id.*; RSA 125-O:11, II. DES has determined that this technology "best balances the procurement, installation, operation and plant efficiency costs with the projected reductions in mercury and other pollutants from the flue gas streams of Merrimack [Station]." RSA 125-O:11, II. According to the legislature, installing the scrubber technology "is in the public interest of the citizens of New Hampshire and the customers of [PSNH]." RSA 125-O:11, VI; *see* RSA 125-O:12, I.

To ensure that PSNH makes "an ongoing and steadfast effort . . . to implement practicable technological or operational solutions to achieve significant mercury reductions" even before the scrubber technology is constructed and installed, the legislature has provided PSNH with certain economic performance incentives administered by DES. RSA 125-O:11, IV; *see* RSA 125-O:16. The legislature has stated that the mercury emission reduction requirements set forth in RSA 125-O:11-:18 "represent a careful, thoughtful balancing of cost, benefits, and technological feasibility" that should be viewed "as an integrated strategy of non-severable components." RSA 125-O:11, VIII.

To comply with the Mercury Emissions Program, PSNH must install the scrubber technology and have it operational at Merrimack Station by July 1, 2013. *See* RSA 125-O:11, I. Meeting "this requirement," however, "is contingent upon obtaining all necessary permits and approvals" from the pertinent regulatory agencies. RSA 125-O:13, I. PSNH must report to the legislature annually regarding its installation of the scrubber technology, including "any updated cost information." RSA 125-O:13, IX. Under RSA 125-O:18, PSNH "shall recover all prudent costs" of installing the scrubber technology "in a manner approved by the [PUC]." Recovery of these costs "shall be . . . via . . . [PSNH's] default service charge." RSA 125-O:18.

In August 2008, the PUC learned from a securities and exchange report filed by PSNH's parent company that the cost of installing this technology had risen from $250 million to $457 million. Thereafter, the PUC directed PSNH to file "a comprehensive status report on its installation plans," including "a detailed cost estimate for the project, an analysis of the anticipated effect of the project on energy service rates, and an analysis of the effect on energy service rates if Merrimack Station were not in the mix of fossil and hydro facilities operated in New Hampshire." *See* RSA 365:5, :19 (1995). Noting a potential conflict between the legislature's express finding that installing scrubber technology at Merrimack Station is "in the public interest of the citizens of New Hampshire and the customers of [PSNH]," RSA 125-O:11, VI, and RSA 369-B:3-a, which provides that PSNH may modify its fossil and hydro generation assets *only* if the PUC finds that it is "in the public interest of retail customers of PSNH to do so,"

the PUC also directed PSNH to file a legal memorandum about the extent of the PUC's authority with respect to the scrubber project. The PUC invited the New Hampshire Office of the Consumer Advocate to do the same.

In September 2008, the PUC decided "that, as a result of the Legislature's mandate that [PSNH] . . . install scrubber technology by a date certain, and its finding pursuant to RSA 125-O:11 that such installation . . . is in the public interest . . . , the [PUC] lacks the authority to make a determination pursuant to RSA 369-B:3-a as to whether this particular modification is in the public interest." The PUC ruled that its authority was "limited to determining at a later time the prudence of the costs of complying with the requirements of RSA 125-O:11-18 and the manner of recovery for prudent costs." *See* RSA 125-O:18.

After the PUC issued its order, the petitioners, whom the PUC had neither directed nor invited to participate in its effort to determine its authority over the scrubber project, moved for a rehearing, asserting standing as commercial ratepayers. PSNH objected. The PUC ruled, however, that the petitioners did have standing:

> The Commercial Ratepayers . . . may be affected financially by changes in PSNH's default energy service rate either as customers taking default energy service, or as customers of competitive electric suppliers. The electric supply market in PSNH's service territory is influenced by PSNH's default service rate because that rate is the backstop for all other competitive offerings. If PSNH's default service rate increases, competitive offerings may also increase.

The PUC denied the motion.

## II. Discussion

### A. Standard of Review

A party seeking to set aside an order of the PUC has the burden of demonstrating that the order is contrary to law or, by a clear preponderance of the evidence, that the order is unjust or unreasonable. RSA 541:13 (2007); *see Appeal of Verizon New England*, 153 N.H. 50, 56 (2005). Findings of fact by the PUC are presumed *prima facie* lawful and reasonable. RSA 541:13; *see Verizon*, 153 N.H. at 56.

### B. Standing

PSNH argues that we should dismiss this appeal because the petitioners lack standing to bring it because the injury they allege, future increased

electrical costs as a result of the scrubber project, is neither immediate nor direct. *See Appeal of Campaign for Ratepayers Rights*, 142 N.H. 629, 632 (1998). The petitioners counter that they have standing: "As ratepayers for electricity generated by [PSNH], [they] will be directly affected by the materially increased costs of installation of scrubber technology at Merrimack Station, and by the [PUC's] Order."

 A party's standing is a question of subject matter jurisdiction, which may be addressed at any time. *Libertarian Party of N.H. v. Sec'y of State*, 158 N.H. 194, 195 (2008). To have standing to appeal an administrative agency decision to this court, a party must demonstrate that his rights "may be directly affected by the decision, or in other words, that he has suffered or will suffer an injury in fact." *Appeal of Richards*, 134 N.H. 148, 154 (quotations and citations omitted), *cert. denied*, 502 U.S. 899 (1991); *see* RSA 541:3 (2007).

In *Appeal of Richards*, we addressed in depth the issue of standing to appeal a PUC decision. In that case, the petitioners were ratepayers, who challenged the PUC's decision to approve a rate plan. *Appeal of Richards*, 134 N.H. at 151. They argued that because "the rate increases that will be imposed upon them as a result of the PUC's approval of the rate plan constitute[d] an injury in fact," they had standing to appeal the PUC's decision. *Id.* at 156 (quotation omitted). We agreed that this "direct economic injury" was sufficient to confer standing upon the ratepayers. *Id.* at 156-57. We stated: "Courts in other jurisdictions have held that ratepayers are directly affected by rate decisions and, thus, have standing to challenge them." *Id.* at 156.

In contrast, the appeal in *Appeal of Campaign for Ratepayers Rights* did not concern a rate plan. In that case, we held that the ratepayers lacked standing to appeal the PUC's decision to approve special contracts between PSNH and certain industrial customers. *Appeal of Campaign for Ratepayers Rights*, 142 N.H. at 632. We concluded that the ratepayers lacked standing because they did not suffer any immediate or direct injury. *Id.* "[A]ny potential injury would arise only through increased rates imposed during a subsequent ratesetting proceeding." *Id.*

 The appeal in this case, like the appeal in *Appeal of Campaign for Ratepayers Rights*, is not an appeal of a rate plan. It concerns the PUC's interpretation of statutes that are unrelated to a rate plan. Here, as in *Appeal of Campaign for Ratepayers Rights*, any potential injury the petitioners may suffer would arise only in a subsequent rate setting proceeding. *See* RSA 125-O:18 (Supp. 2008) (PSNH "shall be allowed to recover all prudent costs" of installing the scrubber technology "in a manner approved by the [PUC]," and recovery of these costs "shall be . . .

via . . . [PSNH's] default service charge"). Such future harm is insufficient, as a matter of law, to confer standing upon the petitioners to appeal the PUC's decision. Accordingly, we dismiss the appeal.

*Appeal dismissed.*

BRODERICK, C.J., and DUGGAN, J., concurred.